1  KARIN G. PAGNANELLI (SBN 174763) kgp@msk.com
   MARC E. MAYER (SBN 190969) mem@msk.com
2  GILBERT S. LEE (SBN 267247) gsl@msk.com
   MITCHELL SILBERBERG & KNUPP LLP
3  11377 West Olympic Boulevard
   Los Angeles, CA  90064-1683
4  Telephone:  (310) 312-2000
   Facsimile:  (310) 312-3100
5
   Attorneys for Defendants
6  ACTIVISION BLIZZARD, INC. and
   ACTIVISION PUBLISHING, INC.
7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11

12  MIL-SPEC MONKEY, INC., a California          CASE NO. CV14-02361 RS
    corporation,
13                                               **NOTICE OF MOTION AND MOTION**
                  Plaintiff,                     **FOR PARTIAL SUMMARY JUDGMENT**
14                                               **AS TO PLAINTIFF'S SECOND, THIRD,**
          v.                                     **FOURTH, AND FIFTH CLAIMS FOR**
15                                               **RELIEF**
    ACTIVISION BLIZZARD, INC., a Delaware
16  corporation; ACTIVISION PUBLISHING,          **MEMORANDUM OF POINTS AND**
    INC., a Delaware corporation; and DOES 1 -   **AUTHORITIES**
17  25, inclusive,
                                                 [Declarations of Yale Miller, Marc E. Mayer,
18                Defendants.                     and Gilbert Lee in Support; and [Proposed]
                                                 Order filed concurrently]
19
                                                 Date:      November 20, 2014
20                                               Time:      1:30 p.m.
                                                 Judge:     Hon. Richard Seeborg
21                                               Courtroom: 3 – 17th Floor

22

23

24

25

26

27

Mitchell
Silberberg &
Knupp LLP

6238549.11

28

CASE NO. CV14-02361 RS

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    **TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

2

3         **PLEASE TAKE NOTICE** that on November 20, 2014, at 1:30 p.m., or as soon as the

4    matter may be heard, in the Courtroom of the Honorable Richard Seeborg of the United States

5    District Court for the Northern District of California, San Francisco Courthouse, Courtroom 3 –

6    17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Activision

7    Publishing, Inc. and Activision Blizzard, Inc. ("Activision") will and hereby do move pursuant to

8    Fed. R. Civ. P. 56 for partial summary judgment on the Second, Third, Fourth, and Fifth Claims

9    for Relief of Plaintiff Mil-Spec Monkey, Inc. ("MSM") for Trademark Infringement (Claim II),

10   False Designation of Origin (Claim III), Unfair Competition (Claim IV), and Common Law

11   Trademark Infringement (Claim V).

12

13        This Motion is made on the basis that MSM's claims against Activision for trademark

14   infringement, false designation of origin, unfair competition, and common law trademark

15   infringement are barred by the First Amendment to the U.S. Constitution.  Specifically, such

16   claims are precluded by <u>Rogers v. Grimaldi</u>, 875 F.2d 994, 999 (2d Cir. 1989), and <u>E.S.S.</u>

17   <u>Entertainment 2000 v. Rock Star Videos</u>, 547 F.3d 1095, 1099 (9th Cir. 2008), because the use of

18   a purported monkey morale patch is artistically relevant to the video game *Call of Duty: Ghosts*

19   and its use in *Ghosts* is not explicitly misleading.

20

21        This Motion is based on this Notice of Motion and Motion and attached Memorandum of

22   Points and Authorities; the concurrently-filed Declarations of Yale Miller, Marc E. Mayer, and

23   Gilbert Lee, and exhibits thereto; all papers and pleadings on file in the action; any reply papers;

24   and any oral argument that the Court may entertain at the hearing on this Motion.

25

26   //

27   //

28   //

Mitchell
Silberberg &
Knupp LLP

6238549.11

CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    DATED:  October 16, 2014            KARIN G. PAGNANELLI
                                         MARC E. MAYER
2                                        GILBERT S. LEE
                                         MITCHELL SILBERBERG & KNUPP LLP
3

4
                                         By:    /s/ Marc E. Mayer
5
                                             Attorneys for Defendants
6                                            ACTIVISION BLIZZARD, INC. and
                                             ACTIVISION PUBLISHING, INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

6238549.11

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>**Page**</u></div>

Introduction ................................................................................................................. 1

I.   STATEMENT OF UNDISPUTED FACTS. ................................................. 3

II.  THE FIRST AMENDMENT BARS MSM'S CLAIMS ARISING FROM THE USE OF THE COD MONKEY PATCH IN *GHOSTS*. ................................................. 9

    A.   Overview Of Applicable Legal Principles. ........................................... 9

    B.   *Ghosts*' Use Of The COD Monkey Patch Is Protected By The First Amendment Under The Prevailing *Rogers* Test. ................................. 10

        1.   The COD Monkey Patch Has "Above Zero" Artistic Relevance To *Ghosts*. ................................................................... 13

        2.   The Use Of The COD Monkey Patch In *Ghosts* Does Not Explicitly Mislead As To MSM's Sponsorship Or Endorsement Of The Product.... 18

III. MSM'S STATE LAW CLAIMS FOR UNFAIR COMPETITION AND "COMMON LAW" TRADEMARK INFRINGEMENT ALSO FAIL. ................................. 21

Conclusion.................................................................................................................. 21

Mitchell
Silberberg &
Knupp LLP

6238549.11

i                                    CASE NO. CV14-02361 RS

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

Brown v. Electronic Arts, Inc.,
724 F.3d 1235 (9th Cir. 2013)............................................................2, 11, 12, 13, 14, 16, 18, 20

Brown v. Entertainment Merchants Association,
131 S. Ct. 2729 (2011) ...........................................................................................................11

Brownmark Films, LLC v. Comedy Partners,
682 F.3d 687 (7th Cir. 2012)...................................................................................................10

Campbell v. Acuff-Rose Music, Inc.,
510 U.S. 569 (1994) ................................................................................................................13

Capcom Co. v. MKR Grp., Inc.,
No. C 08-0904 RS, 2008 U.S. Dist. LEXIS 83836 (N.D. Cal. Oct. 10, 2008) .........................10

Dillinger LLC v. Elec. Arts Inc.,
No. 09-cv-1236, 2011 U.S. Dis. LEXIS 64006 (S.D. Ind. June 16, 2011) ........10, 14, 17, 18, 20

E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,
547 F.3d 1095 (9th Cir. 2008)...............................................................3, 9, 12, 13, 15, 16, 18, 21

Hoffman v. Capital Cities/ABC, Inc.,
255 F.3d 1180 (9th Cir. 2001)..................................................................................................20

Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.,
329 F.3d 954 (8th Cir. 2003)....................................................................................................11

Kirby v. Sega of Am., Inc.,
144 Cal. App. 4th 47 (2006).................................................................................................9, 11

Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.,
868 F. Supp. 2d 172 (S.D.N.Y. 2012) ...........................................................................13, 17, 20

Mattel, Inc. v. MCA Records, Inc.,
296 F.3d 894 (9th Cir. 2002)..............................................................................11, 12, 13, 18, 21

Mattel Inc. v. Walking Mountain Prod.,
353 F.3d 792 (9th Cir. 2003)..............................................................................................13, 21

NovaLogic, Inc. v. Activision Blizzard,
-- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298 (C.D. Cal. June 18, 2013)
....................................................................................1, 2, 3, 6, 10, 12, 13, 14, 15, 16, 19

Rogers v. Grimaldi,
875 F.2d 994 (2d Cir. 1989)................................................2, 10, 12, 13, 15, 16, 17, 18, 20, 21

Mitchell
Silberberg &
Knupp LLP

6238549.11

ii

CASE NO. CV14-02361 RS

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Roxbury Entm't v. Penthouse Media Grp.,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009)..........................................................................9, 11, 18

Stewart Surfboards, Inc. v. Disney Book Grp.,
    No. CV 10-2982, 2011 U.S. Dist. LEXIS 155444 (C.D. Cal. May 11, 2011)
    .......................................................................................................10, 16, 17, 18, 19, 20

Winchester Mystery House, LLC v. Global Asylum, Inc.,
    210 Cal. App. 4th 579 (2012).......................................................................................19

**OTHER AUTHORITIES**

Lemley, Mark A., The Modern Lanham Act and the Death of Common Sense, 108
    Yale L.J. 1687, 1695-96 (1999) ..................................................................................10

Mitchell
Silberberg &
Knupp LLP

6238549.11

iii                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

## **Introduction**

Defendants Activision Publishing, Inc. and Activision Blizzard Inc. (collectively, "Activision") are the makers and publishers of the video game *Call of Duty: Ghosts* ("*Ghosts*"), the most recent entry in Activision's popular *Call of Duty* video game franchise.[1] As with the rest of the *Call of Duty* franchise, *Ghosts* is a realistic, highly competitive military action video game in which players assume the role of military soldiers to battle against each other in a variety of single-player and online multiplayer battlefields. Plaintiff Mil-Spec Monkey, Inc. ("MSM") is a designer of military "morale patches," which are interchangeable Velcro-backed patches that are commonly worn by soldiers on their uniforms or rucksacks to express their individuality or mood. Among the morale patches sold by MSM is a patch depicting an angry monkey face. In this action, MSM claims, among other things, that Activision has infringed MSM's purported trademark in its angry monkey face design – and thereby confused consumers as to the source of the game *Ghosts* – because among the ways that players may customize their characters in *Ghosts* is by outfitting them with over six-hundred different personal morale patches, one of which depicts a different angry monkey face design (in actuality, that of a chimpanzee).

By this Motion, Activision seeks summary judgment on MSM's claims for trademark infringement, false designation of origin, and unfair competition (and only these claims) for the single but dispositive reason that Activision's alleged use of a monkey face patch in *Ghosts* is protected by the First Amendment. As has been made clear by the prevailing caselaw in this circuit and others, reference to another's trademark in the context of an expressive work should not give rise to claims for trademark infringement. Indeed, a case decided one year ago involving trademark claims against another *Call of Duty* game confirms that the use of another's trademark in conjunction with creating an authentic or convincing video game simulation of the real world is protected by the First Amendment. See generally NovaLogic, Inc. v. Activision Blizzard, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298 (C.D. Cal. June 18, 2013).

---

[1] Activision Blizzard, Inc. is the parent company of Activision Publishing, Inc. Because Activision Publishing, Inc. was the party who marketed and published the game, Activision Blizzard, Inc. is not a proper party in the case. Nevertheless, for purposes of this Motion, the two entities are collectively referred to as "Activision."

Mitchell
Silberberg &
Knupp LLP

6238549.11

1   CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   That same approach governs here.  It is now well-established that in assessing whether

2   claims arising from the use of a trademark in an expressive work, including a video game, are

3   barred by the First Amendment, courts in this Circuit apply the two-part test set forth in <u>Rogers v.</u>

4   <u>Grimaldi</u>, 875 F.2d 994, 999 (2d Cir. 1989).  <u>See</u> <u>Brown v. Electronic Arts, Inc.</u>, 724 F.3d 1235,

5   1235 (9th Cir. 2013); <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *33-*34.

6   "The <u>Rogers</u> test is relatively straightforward to apply, and is very protective of speech," <u>id.</u> at

7   *35, and accordingly, under the <u>Rogers</u> test, the use of a trademark in an expressive work would

8   fall outside the protection of the First Amendment only where (1) the use of the mark has ***no***

9   artistic relevance to the underlying work whatsoever, or, (2) if it has some artistic relevance, it

10  explicitly misleads consumers as to the source or the content of the work.

11  Both prongs of this test plainly are met here.  MSM cannot credibly claim that the use of

12  military patches, including a patch depicting a monkey, has ***no*** artistic relevance whatsoever to a

13  video game about military soldiers.  To the contrary, MSM specifically alleges in its Complaint

14  that as a general matter, "morale patches are popular among military personnel" as a means of

15  "allow[ing] the wearer to express a sense of personal sense of identity," and that one of the best

16  known morale patches is its angry monkey patch.  Compl. ¶¶ 14-15, 18.  MSM has furthermore

17  disseminated to the public a host of photographs and other images of military soldiers in the field

18  wearing a variety of morale patches, including its angry monkey patch.  In light of these facts, the

19  presence of a monkey design among the hundreds of patches available in *Ghosts* not only has

20  "some" artistic relevance, it is consistent with *Ghosts'* efforts to evoke the look and feel of real

21  military soldiers and to utilize graphics of patches as a means of differentiating among soldiers in

22  the game.  Likewise, there is no dispute that *Ghosts* does not explicitly mislead as to its source.

23  "[G]iven the huge success of its 'Call of Duty' franchise, Activision understandably has made

24  every effort to affirmatively negate any possible confusion regarding the source" of its games.

25  <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *40.  *Ghosts* is no exception:

26  The game clearly states that it is an Activision product, makes no reference whatsoever to MSM,

27  does not claim to be affiliated with or sponsored by MSM in any way (in fact, the monkey patch in

28

Mitchell
Silberberg &
Knupp LLP

6238549.11

2                                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Ghosts* is substantially different from MSM's angry monkey), and thus the game does not "explicitly" mislead consumers as to the source of *Ghosts.*

Given the artistic relevance of the use of a monkey patch in *Ghosts* (certainly "above zero," <u>E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.</u>, 547 F.3d 1095, 1100 (9th Cir. 2008)), and the absence of any statements connecting the game to MSM, the First Amendment plainly applies to MSM's trademark and related claims. Accordingly, the Court should grant this Motion and enter summary judgment in Activision's favor on MSM's Second, Third, Fourth, and Fifth Claims for Relief.

## I.   STATEMENT OF UNDISPUTED FACTS.

This Motion presents an issue of pure law that requires no discovery. *Ghosts* speaks for itself, and the artistic relevance of the patch at issue can be readily ascertained from review of the game, MSM's patch, MSM's own admissions and allegations, and other widely available reference material. <u>See generally</u>, <u>e.g.</u>, <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298 (relying on similar materials in granting summary judgment). Accordingly, the facts presented here are derived from the game itself, MSM's own admissions and allegations, and publicly available reference material.

**Military Morale Patches.** As MSM states in its Complaint, "***morale patches are popular among military personnel and are often worn in unofficial contexts to allow the wearer to express a sense of personal sense of identity***." Compl. ¶ 14 (emphasis added). Other sources confirm that "morale patches" are non-regulation patches worn by military soldiers or other personnel on their uniforms, rucksacks, backpacks or other gear as a means of self-expression or to impart humor or levity during tours of duty. <u>See</u> Decl. of Marc Mayer ¶ 3, Ex. 7 (defining morale patches as "[u]nofficial patches that are used by a unit. Morale patches may be, but are not necessarily, approved. Such patches are designed to raise the 'morale' of the unit, thus the origins of the term."); Mayer Decl. ¶ 5, Ex. 9 at 1 ("Morale patches are similar to standard military unit designators, but are non-sanctioned and unofficial. These morale patches are typically irreverent or humorous and either support a different view of a unit/job, or poke fun at other aspects of the

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

military.").  Morale patches typically are Velcro-backed (and military uniforms are often outfitted with a corresponding Velcro panel) so that soldiers can easily swap out one morale patch for another depending on his or her mood or situation.  See Mayer Decl. ¶ 4, Ex. 8 at 2; Mayer Decl. ¶ 5, Ex. 9 at 2.  Morale patches are sometimes collected or traded, and may be more or less valuable depending on their rarity or popularity.  See Mayer Decl. ¶ 4, Ex. 8 at 2.

The use of patches by members of the U.S. military is a tradition that dates back centuries. Military patches serve a variety of purposes:  They identify the soldier as being part of a particular unit, they foster a sense of collective identity, they serve as a source of pride, and in some cases they allow the soldier a means of self-expression.  See Mayer Decl. ¶ 6, Ex. 10 ("Soldiers wear a wide assortment of insignia, ribbons, medals, badges, tabs and patches.  To the uninitiated, the variety can be bewildering.  Yet, each device represents a Soldier's accomplishment – or that of his or her unit – and is a great source of pride and accomplishment.").  As one author noted, since the first use of troop insignia patches (likely during the Civil War),

> [t]here are now thousands and thousands of patches in the modern armed forces, depicting everything from a soldier's unit, to the many programs a soldier might be charged with, to his or her role within an organization.  There are patches custom-made to commemorate special events, and "Friday" patches (informal, and often more colorful, patches that airmen are allowed to wear on Fridays).  Simply put, the military has patches for almost everything it does.

Mayer Decl. ¶ 7, Ex. 11 at 8-9.

Consistent with MSM's assertion that "morale patches are popular among military personnel" (Compl. ¶ 14), it is common to see such patches in images or photographs or other depictions of military personnel.  MSM, for example, has a compilation of such images on its own website, see Mayer Decl. ¶ 8, Ex. 12, and other such depictions are readily available as well, see Mayer Decl. ¶ 14, Ex. 18.

Hundreds of different morale patches are available to the public, both military and non-military.  There are clearly delineated recurring themes in the world of morale patches:  Chief among them are animals, particularly jungle animals, such as monkeys, rhinoceros, and tigers. See Mayer Decl. ¶ 9, Ex. 13; Mayer Decl. ¶ 13, Ex. 17 at pp. 6-7, 86-89, 132-33, 192-93, 222-223. MSM's own online store, for example, lists a separate category devoted entirely to animal patches,

1    containing thirty-three patches.  See Mayer Decl. ¶ 10, Ex. 14.  Other categories of patches

2    include:  predators or venomous animals (such as snakes, sharks, and killer whales); mythical or

3    extinct creatures such as unicorns, dinosaurs, and chimera (such as "sharktopus"); skulls; flags;

4    Americana (e.g., "Don't Tread on Me"); monsters; zombies; demons; weapons; "fun meters"; and

5    "pin-up" girls.  Many morale patches also are overtly humorous or irreverent, and may contain

6    offbeat or off-color slogans such as "Major League Doorkicker" or "Embrace the Suck."  See

7    Mayer Decl. ¶ 9, Ex. 13; Mayer Decl. ¶ 13, Ex. 17 at pp. 6-7, 86-89, 132-33, 192-93, 222-223.

8            **MSM and Its "Angry Monkey" Morale Patch.**  MSM is a military supply and outfitting

9    company that specializes in the design and creation of military morale patches.  MSM sells a

10   variety of morale patches through its online store, at tradeshows, and through other online retailers

11   and military supply retailers.  Compl. ¶¶ 17-18.  MSM currently sells approximately 184 different

12   patches, representing a variety of common morale patch themes such as animals, pinup girls,

13   slogans, and "trouble makers" (i.e., obnoxious, offensive, or sexually explicit images and slogans).

14   See Mayer Decl. ¶ 10, Ex. 14.  Several of MSM's patches are derived from, or appropriate, third

15   party trademarks or copyrights such as the trademarks of Major League Baseball, Jack Daniels,

16   and "Team America:  World Police."

17           Among the images used on MSM's morale patches is an image of a chimpanzee wearing

18   headphones with an angry expression on its face (the "MSM Monkey Patch"):

19
20   
21

22   MSM claims that the MSM Monkey Patch is "[a]mong MSM's most well-known designs."

23   Compl. ¶ 15.  MSM prominently displays on its website military personnel in the field wearing the

24   MSM Monkey Patch.[2]  See Mayer Decl. ¶ 8, Ex. 12.  The MSM Monkey Patch is sold both on

25

26

27   _____
     [2]  MSM is not the only provider of military patches depicting monkeys.  For example, the website
28   "Monkey Depot" sells patches depicting a "Greaser Monkey" and "Maverick Monkey."  See
     Mayer Decl. ¶ 11, Ex. 15.

Mitchell
Silberberg &
Knupp LLP

6238549.11

1    MSM's own online store and by a variety of third-party military outfitters and websites.  Compl. ¶

2    18.

3        **Activision and the *Call of Duty* Franchise.**  Activision is a video game publisher,

4    engaged in the business of developing, financing, producing, marketing, and distributing video

5    games, including the *Call of Duty* series of video games.  As the Central District observed in

6    rejecting a similar trademark claim against a previous *Call of Duty* game on First Amendment

7    grounds, "[t]he 'Call of Duty' games are military action fantasy games, in which a player assumes

8    control of a military soldier and fights against a computer-controlled or human-controlled

9    opponent across a variety of computer-generated battlefields."  NovaLogic, -- F. Supp. 2d --, 2013

10   U.S. Dist. LEXIS 188298, at *6.  To date, 10 "core" *Call of Duty* games have been released to the

11   public, starting in 2003, including *Call of Duty*, *Call of Duty 2*, *Call of Duty 3*, *Call of Duty 4:*

12   *Modern Warfare*, *Call of Duty: World At War*, *Call of Duty: Modern Warfare 2*, *Call of Duty:*

13   *Black Ops*, *Call of Duty: Modern Warfare 3*, *Call of Duty: Black Ops 2*, and, most recently, *Call*

14   *of Duty: Ghosts*.  See Decl. of Yale Miller ¶ 2.  The *Call of Duty* games take place over various

15   time periods, including World War II and the near-future, and depict a variety of real-world

16   settings such as Normandy, the former Soviet Union, and the Middle East.  See Miller Decl. ¶ 3.

17       The *Call of Duty* games are known for their realistic and accurate portrayal of soldiers and

18   special forces operatives.  See NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *7

19   ("[The 'Call of Duty' game at issue] is a very realistic and convincing … portrayal of modern

20   combat operations.");  Miller Decl. ¶ 3.  Thus, for example, the games depict real-life military units

21   (such as the United States Army Rangers, the British SAS, and the Russian Spetsnaz) and include

22   military weapons, vehicles, and uniforms that are based on their real-life or historical counterparts

23   or on studied approximations of what such objects would be in 5 or 10 years' time.  See

24   NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *7 ("The weapons depicted [in

25   the 'Call of Duty' game at issue] are extremely realistic," and "the names and logos of actual

26   combat forces are used, such as the U.S. Army Rangers and the British Special Air Service.");

27   Miller Decl. ¶ 3.

28

Mitchell
Silberberg &
Knupp LLP

6238549.11

6                                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    **Call of Duty:  Ghosts.**  In or about November 2013, Activision released *Call of Duty:*

2    *Ghosts*.  Like its predecessors, *Ghosts* is a "first person" military combat action video game in

3    which players play as soldiers engaged in intense combat in a war-torn near-future setting.  <u>See</u>

4    Miller Decl. ¶ 6.  Like the other *Call of Duty* games, *Ghosts* features highly realistic and authentic

5    weapons, uniforms, vehicles, and settings.  <u>See</u> Miller Decl. ¶ 6.  *Ghosts* features several game

6    types, including a single-player story-driven campaign and a variety of online multiplayer modes,

7    both cooperative and competitive.  <u>See</u> Miller Decl. ¶ 4.  *Ghosts*' primary multiplayer mode

8    allows players to adopt the role of a military soldier and engage in an assortment of combat-based

9    matches across several "maps" or locations.  <u>See</u> Miller Decl. ¶ 8.

10          As part of the military fantasy offered by *Ghosts*', one feature offered is that before

11   engaging in online play, the player may select and personalize (i.e., "customize") his or her soldier

12   avatar, offering thousands of different combinations to the player.  <u>See</u> Miller Decl. ¶ 9 & Ex. 4;

13   Mayer Decl. ¶ 12, Ex. 16 ("In Call of Duty®: Ghosts you don't just create a class, you create a

14   soldier.  Choose the head, body type, head-gear, and equipment, and you can even create a female

15   soldier for the first time.  With over 20,000 possible combinations, you can create the soldier

16   you've always wanted.").  *Ghosts* offers a wide range of customization options through which a

17   player can modify the appearance of his or her soldier to reflect the player's personal tastes or to

18   allow the soldier to be more easily recognizable on the battlefield.  <u>See</u> Miller Decl. ¶ 9 & Ex. 4.

19   Through a "Customize Appearance" menu offered in conjunction with *Ghosts*' "Create-A-Soldier"

20   feature, the player can modify, for example, the soldier's gender and ethnicity, and select from a

21   variety of uniforms, uniform styles, headgear, and patches to be worn on the player's uniform

22   during a multiplayer match.  <u>See</u> Miller Decl. ¶ 9 & Ex. 4.  The players may also choose a distinct

23   "background" to be displayed behind the player's name during a multiplayer match.  <u>See</u> Miller

24   Decl. ¶ 9 & Ex. 4.

25          A player is presented with, and may select from, a wide variety of patches; a total of over

26   600 are available in conjunction with the game.  <u>See</u> Miller Decl. ¶ 10.  Similar to various military

27   patches, the patches offered to players depict a small cartoon image or icon inside a geometric

28   shape such as a circle, octagon, or shield.  <u>See</u> Miller Decl. ¶ 10.  Selecting a particular morale

Mitchell
Silberberg &
Knupp LLP

6238549.11

7                                              CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

patch causes the patch to be placed on the left arm of the soldier's uniform when the soldier is depicted in the game.  See Miller Decl. ¶ 11.  During a multiplayer match, depending on various player choices and gameplay, a player may briefly see another player's selected patch on that player's uniform.  See Miller Decl. ¶ 11 & Ex. 5.  Additionally, if a player accomplishes certain objectives in certain multiplayer modes of the game (e.g., a string of kills), the name of the player who performed the objective is flashed momentarily on the screen to all players in the match, along with a small image of the patch selected by that player and, depending on the objective, sometimes also with the "background" image selected by the player.  The patch is also displayed to the player along with other information as part of a "match summary" screen after conclusion of the match.  See Miller Decl. ¶ 11 & Ex. 5.[3]

Thirty-two patches are available at the start of the game, and hundreds of additional patches are "unlocked" by completing challenges in multiplayer matches.  See Miller Decl. ¶ 10.  (The patches other than the "standard issue" ones are initially "locked," i.e., are grayed out and accompanied by an image of a padlock.  See Miller Decl. ¶ 10.)  Each of the patches offered to the player represent the types of morale patches that are commonly seen in the field or worn by military soldiers.  Thus, just as in the real world, the morale patches available to *Ghosts* players include animals, insects, unicorns, monsters, flags, cartoons, skulls, slogans, and many others.  See Miller Decl. ¶ 9, Ex. 4.

One of the more than 600 patches contained in the game is a patch depicting a cartoon face of a chimpanzee (the "COD Monkey Patch").  The COD Monkey Patch has significant differences from the MSM Monkey Patch – among them, the COD Monkey Patch is shaped differently, is covered with fur, has chimpanzee-like ears, includes eyelids, and generally is less a caricature of a monkey:

---

[3] A player does not have to customize his or her soldier (many players do not), nor does he or she have to select a patch even if other aspects of the soldier are customized.  In such cases, the patch that displays on the uniform is defaulted to a "Recruit" patch, which consists of a star and golden-colored wings.  If a player selects the default patch or some other patch other than the COD Monkey Patch, a player would never see the Monkey Patch while playing *Ghosts* unless one of the other players in a multiplayer match selected the Monkey Patch as his or her patch.  See Miller Decl. ¶ 12.

Mitchell
Silberberg &
Knupp LLP

6238549.11

8                    CASE NO. CV14-02361 RS
NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

The COD Monkey Patch is just one of several patches in the game depicting animals.  <u>See</u> Miller Decl. ¶ 9, Ex. 4.

The COD Monkey Patch does not appear in any part of the single player campaign mode, nor in the trailer advertising that game mode.  <u>See</u> Miller Decl. ¶¶ 7, 12 & Ex. 3.  The COD Monkey Patch does not appear on the packaging of *Ghosts*.  <u>See</u> Miller Decl. ¶ 5, Exs. 1 & 2.  Instead, the packaging for *Ghosts*, consistent with other games in the *Call of Duty* series, prominently displays the "CALL OF DUTY" logo in white block letters, along with logos of Activision and Infinity Ward, one of the studios that designed the game.  <u>See</u> Miller Decl. ¶ 5, Exs. 1 & 2.  Other than in the game itself, the only instance in which the COD Monkey Patch appears is in a pre-release trailer, which promotes the multiplayer game mode and illustrates various customization options.  In the trailer, a very small image of the COD Monkey Patch appears, along with more than ten other morale patch images, scrolling across the screen for less than one to two seconds in the nearly three-minute-long trailer.  <u>See</u> Miller Decl. ¶ 13 & Ex. 6.  MSM is never once mentioned or referred to in ***any*** manner in connection with *Ghosts*, either within or outside the game.

## II.  THE FIRST AMENDMENT BARS MSM'S CLAIMS ARISING FROM THE USE OF THE COD MONKEY PATCH IN *GHOSTS*.

### A.  <u>Overview Of Applicable Legal Principles.</u>

"In cases involving free speech, a speedy resolution is desirable because protracted litigation may chill the exercise of First Amendment rights.  For that reason, summary judgment is a favored remedy in free speech cases."  <u>Kirby v. Sega of Am., Inc.</u>, 144 Cal. App. 4th 47, 54 (2006).  Courts thus routinely grant summary judgment, if not motions to dismiss, for the defendant in cases involving the interplay of the Lanham Act and the First Amendment.  <u>See, e.g.</u>, <u>E.S.S.</u>, 547 F.3d at 1099 (affirming summary judgment for defendant); <u>Roxbury Entm't v.</u>

Mitchell
Silberberg &
Knupp LLP

6238549.11

9                                CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Penthouse Media Grp., 669 F. Supp. 2d 1170, 1172 (C.D. Cal. 2009) (summary judgment for defendant); Stewart Surfboards, Inc. v. Disney Book Grp., No. CV 10-2982, 2011 U.S. Dist. LEXIS 155444 (C.D. Cal. May 11, 2011) (motion to dismiss granted).

No factual discovery is required to decide this Motion, which is based on the products at issue and the manner in which the trademarks are used in those products.  The applicability of the First Amendment is often decided as a matter of law simply from review of the work at issue and/or widely available source material.  See, e.g., id. at *13 & n.2; NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298.  Additionally, the defendants' knowledge or intent is irrelevant. See Dillinger LLC v. Elec. Arts Inc., No. 09-cv-1236, 2011 U.S. Dis. LEXIS 64006, at *17-*18 (S.D. Ind. June 16, 2011) (reasons why Dillinger name was used in video game were irrelevant). Accord Brownmark Films, LLC v. Comedy Partners, 682 F.3d 687, 690 (7th Cir. 2012) (to decide analogous copyright fair use defense, "the only two pieces of evidence needed to decide the question of fair use" were the plaintiff's and defendant's works).  Here, the parties' products speak for themselves, there are no disputed material facts, and judgment is warranted as a matter of law on Activision's First Amendment defense to MSM's trademark, false designation of origin, and unfair competition claims.

## B.  *Ghosts'* Use Of The COD Monkey Patch Is Protected By The First Amendment Under The Prevailing *Rogers* Test.

"'[T]rademark law is concerned with the protection of symbols, elements or devices ***used to identify a product in the marketplace and to prevent confusion as to its source***.'"  Capcom Co. v. MKR Grp., Inc., No. C 08-0904 RS, 2008 U.S. Dist. LEXIS 83836, at *34 (N.D. Cal. Oct. 10, 2008) (emphasis added) (quoting RDF Media Ltd. v. Fox Broad. Co., 372 F. Supp. 2d 556, 563 (C.D. Cal. 2005)); see also Mark A. Lemley, The Modern Lanham Act and the Death of Common Sense, 108 Yale L.J. 1687, 1695-96 (1999) ("We give protection to trademarks for one basic reason:  to enable the public to identify easily a particular product from a particular source.").[4]

---

[4] This Motion addresses only MSM's trademark and related claims, not MSM's separate copyright claim (its First Claim for Relief).  This Motion is directed at the narrow legal question of whether the First Amendment shields *Ghosts*'s use of the COD Monkey Patch against allegations that such a patch supposedly creates confusion as to source the source of *Ghosts*.  With respect to MSM's

(…continued)

Mitchell
Silberberg &
Knupp LLP

6238549.11

10                                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    Consistent with that aim, "'[t]rademark rights do not entitle the owner to quash an unauthorized

2    use of the mark by another who is communicating ideas or expressing points of view.'"  Mattel,

3    Inc. v. MCA Records, Inc., 296 F.3d 894, 900 (9th Cir. 2002) (quoting L.L. Bean, Inc. v. Drake

4    Publishers, Inc., 811 F.2d 26, 29 (1st Cir. 1987)).  "Were [courts] to ignore the expressive value

5    that some marks assume, trademark rights would grow to encroach upon the zone protected by the

6    First Amendment."  MCA, 296 F.3d at 900.  Thus, "[t]he First Amendment can provide a

7    complete defense to Lanham Act claims involving artistic works."  Roxbury, 669 F. Supp. 2d at

8    1175.

9         It now is beyond dispute that video games such as *Ghosts* are core speech protected by the

10   First Amendment, just as are books, plays, and movies.  As explained by the Supreme Court in

11   Brown v. Entertainment Merchants Association, 131 S. Ct. 2729, 2733 (2011):

12        Like the protected books, plays, and movies that preceded them, video games
          communicate ideas – and even social messages – through many familiar literary
13        devices (such as characters, dialogue, plot, and music) and through features
          distinctive to the medium (such as the player's interaction with the virtual world).
14        That suffices to confer First Amendment protection…. [W]hatever the challenges
          of applying the Constitution to ever-advancing technology, "the basic principles of
15        freedom of speech and the press, like the First Amendment's command, do not
          vary" when a new and different medium for communication appears.
16

17   See also Brown, 724 F.3d at 1241 ("[T]he Supreme Court has answered with an emphatic 'yes'

18   when faced with the question of whether video games deserve the same protection as more

19   traditional forms of expression."); Kirby, 144 Cal. App. 4th at 58 ("Video games are expressive

20   works entitled to as much First Amendment protection as the most profound literature.");

21   Interactive Digital Software Ass'n v. St. Louis Cnty., Mo., 329 F.3d 954, 957 (8th Cir. 2003) ("If

22   the First Amendment is versatile enough to 'shield [the] painting of Jackson Pollock, music of

23   Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll,' we see no reason why the pictures,

24   graphic design, concept art, sounds, music, stories, and narrative present in video games are not

25   entitled to similar protection.").  The Central District likewise concluded, with respect to a

26   _____

27   (…continued)
     copyright claim, Activision contends that the MSM Angry Monkey Patch and COD Monkey Patch
     are not substantially similar, including as to any protectable or copyrightable elements.  MSM's
28   copyright claims will be addressed at a later time.

Mitchell
Silberberg &
Knupp LLP

6238549.11

11                              CASE NO. CV14-02361 RS
NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

1    previous *Call of Duty* game, that "based on its compelling narrative and music, distinctive

2    characters, how the players interact with the virtual environment as they complete a series of

3    combat missions … , ['Call of Duty: Modern Warfare 3'] is an expressive work entitled to as

4    much First Amendment protection as any motion picture or any other expressive work."

5    NovaLogic, 2013 U.S. Dist. LEXIS 188298, at *29-*30.

6            In balancing trademark law and the First Amendment, courts in this circuit have long

7    evaluated trademark claims involving expressive works using the test articulated in Rogers v.

8    Grimaldi, 875 F.2d 994, 999 (2d Cir. 1989).  See MCA, 296 F.3d at 902 ("We agree with the

9    Second Circuit's analysis and adopt the Rogers standard as our own."); E.S.S., 547 F.3d at 1099

10   (also employing Rogers); Brown, 724 F.3d at 1241 ("We are convinced that the Rogers test

11   remains the appropriate framework [for analyzing the balance between trademark and the First

12   Amendment].").  In Rogers, the Second Circuit Court of Appeals dismissed on First Amendment

13   grounds claims by the estate of Ginger Rogers against the producers and distributors of a film

14   titled *Ginger and Fred* about the reunion of two fictional cabaret performers.  In its ruling, the

15   Second Circuit recognized and articulated the need for narrow construction of the Lanham Act to

16   avoid a conflict with First Amendment values, even if the use of the trademark might result in

17   some consumer confusion:  "[T]he slight risk that such use of a [trademark] might implicitly

18   suggest endorsement or sponsorship to some people is outweighed by the danger of restricting

19   artistic expression, and the Lanham Act is not applicable."  875 F.2d at 1000.

20           The Second Circuit thus crafted a specific test to determine whether the "public interest in

21   avoiding consumer confusion *outweighs* the public interest in free expression."  E.S.S., 547 F.3d

22   at 1099 (emphasis in original) (quoting Rogers, 875 F.2d at 999).  Under the two-part Rogers test,

23   "[a]n artistic work's use of a trademark that otherwise would violate the Lanham Act is not

24   actionable 'unless [1] the [use of the mark] has no artistic relevance to the underlying work

25   whatsoever, or, [2] if it has some artistic relevance, unless [it] explicitly misleads as to the source

26   or the content of the work.'"  E.S.S. 547 F.3d at 1099 (quoting MCA, 296 F.3d at 902).  Rogers

27   has been adopted as the law in the Ninth Circuit, and it has been applied to a wide variety of

28   expressive works, including video games, sound recordings, photographs, and motion pictures.

Mitchell
Silberberg &
Knupp LLP

6238549.11

12                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

See E.S.S., 547 F.3d at 1095 (video game); Mattel Inc. v. Walking Mountain Prod., 353 F.3d 792, 807 (9th Cir. 2003) (artistic photographs); MCA, 296 F.3d at 902 (popular song); NovaLogic, 2013 U.S. Dist. LEXIS 188298, at *34 (*Call of Duty* video game).  Additionally, in applying the Rogers test, it is irrelevant that some consumers might actually have been confused or even are likely to be confused.  See Rogers, 875 F.2d at 1001 ("To the extent that there is a risk that the title will mislead consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression.").  All that is relevant is that the use has some minimal artistic relevance and is not ***explicitly*** misleading.  See Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc., 868 F. Supp. 2d 172, 184 (S.D.N.Y. 2012) ("[E]ven assuming, *arguendo*, that Louis Vuitton could state a cognizable claim of confusion, Warner Bros' use of the Diophy bag is protected under Rogers because it has some artistic relevance to the Film and is not explicitly misleading.").  As a matter of law, and as set forth below, MSM cannot satisfy either prong of the Rogers test.

### 1.    The COD Monkey Patch Has "Above Zero" Artistic Relevance To *Ghosts*.

"The Rogers test is relatively straightforward to apply, and is very protective of speech," NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *35.  Accordingly, it is well established in this circuit that "only the use of a trademark with '***no artistic relevance*** to the underlying work ***whatsoever***'" fails to warrant First Amendment protection.  E.S.S., 547 F.3d at 1100 (emphases added) (quoting Rogers, 875 F.2d at 999).  In other words, "[t]he level of relevance merely must be ***above zero***."  Id.; see also Brown, 724 F.3d at 1243.  There is good reason for this lenient standard:  "This black-and-white rule has the benefit of limiting our need to engage in artistic analysis in this context."  Id.  Were it otherwise, the court would be required to make subjective artistic judgments or to evaluate the merits and purposes of a creative work.  See, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 582 (1994) ("'[I]t would be a dangerous undertaking for persons trained only in the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits.'") (quoting Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903)); Walking Mountain, 353 F.3d at 801 (citing same);

1   <u>Dillinger</u>, 2011 U.S. Dist. LEXIS 64006, at *15 ("[I]t is not the role of the Court to determine how

2   meaningful the relationship between a trademark and the content of a literary work must be…."). 

3   The "artistic relevance" prong is thus an objective analysis, and is not dependent upon the intent or

4   motivations of the defendant or its artists.  <u>See, e.g.</u>, <u>id.</u> at *17-*18 ("[T]hat no one can remember

5   how the weapons were named has little-to-no bearing on any 'actual nexus' between Dillinger and

6   the content of the *Godfather* games."). 

7            Activision's use of the COD Monkey Patch far surpasses the "above zero" artistic

8   relevance threshold required to meet this first prong.  "The 'Call of Duty' games," such as *Ghosts*,

9   "are military action fantasy games in which a player assumes control of a military soldier."

10  <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *6; <u>see also</u> Miller Decl. ¶¶ 2-3,

11  6.  Like real soldiers in the field, players are given access to realistic military uniforms, clothing,

12  weapons, and technology.  <u>See</u> Miller Decl. ¶¶ 3, 6.  Uniform colors and designs are authentically

13  rendered, making the character appear to be a real military soldier, wearing realistic military gear.

14  <u>See, e.g.</u>, <u>Brown</u>, 724 F.3d at 1243 (use of professional football players was relevant to game

15  involving competitive football matches).  In the context of the fictional military field operations

16  depicted in *Ghosts*, it is wholly logical and appropriate for soldiers, among several other

17  customization options, to be outfitted with, and identified by, a variety of morale patches, just as

18  are active soldiers in the field.  Moreover, consistent with the fact that "morale patches are popular

19  among military personnel and are often worn in unofficial contexts to allow the wearer to express

20  a sense of personal sense of identity," as MSM admits (Compl. ¶ 14), it is also artistically relevant

21  to use displays of graphics of morale patches as a quick means of identifying players who

22  accomplish various objectives during the often-frenetic action of a multiplayer game.  <u>See</u> Miller

23  Decl. ¶ 11 & Ex. 5.  The use of such patches to identify a soldier during a multiplayer match is

24  thus "not wholly unrelated to the content of the work" (<u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S.

25  Dist. LEXIS 188298, at *36) and is a reasonable artistic choice as well.  <u>See also</u> Mayer Decl. ¶

26  13, Ex. 17 at p. v (noting that patches are a "medium of self-expression").[5]

27

---

[5]  The First Amendment applies just as strongly to promotional materials in connection with
*Ghosts*.  "[C]ourts have consistently held that First Amendment protection for expressive use does

(…continued)

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

6238549.11

It is also a wholly appropriate artistic choice to select or devise patches in *Ghosts* that evoke the range of morale patches available to soldiers and members of the public.  See Mayer Decl. ¶ 9, Ex. 13; Mayer Decl. ¶ 13, Ex. 17 at pp. 6-7, 86-89, 132-33, 192-93, 222-223; see also Mayer Decl. ¶ 10, Ex. 14.  Thus, the morale patches available to players naturally include patches depicting animals, insects, monsters, skulls, weapons, cartoons, and flags.  Notably, MSM specifically alleges that its MSM Angry Monkey Patch is among its "most well-known designs" (Compl. ¶ 15), and it has posted to the Internet numerous images of real-life soldiers wearing its patches, including its Angry Monkey Patch.  See Mayer Decl. ¶ 8, Ex. 12.  Thus, the inclusion of a patch depicting a monkey among various other animals, as but one in a slate of over 600 patches in the game, contributes to the authenticity demanded by the game and thus is relevant to *Ghosts*' overall design and artistic vision.  Again, certainly the artistic relevance is "above zero," which is all that is required under Rogers.  E.S.S., 547 F.3d at 1100; see also NovaLogic, 2013 U.S. Dist. LEXIS 188298, at *36 (in "Call of Duty: Modern Warfare 3," the "use of the phrase 'Delta Force' and the MW3 Delta Force Logo give users of MW3 a particularized reality of being part of an actual elite special forces operation and serve as a means to increase specific realism of the game" and "help satisfy the ever increasing demand for 'authentic simulation' in video games … which undoubtably accounts for its enormous success").

Several recent cases (including two Ninth Circuit decisions that deal directly with video games) are highly analogous, if not directly on point.  In E.S.S., 547 F.3d at 1095, the Ninth Circuit evaluated trademark claims brought by the owner of a strip club ("The Play Pen") arising from the use of a modified version of its name and logo ("The Pig Pen") for a fictional strip club in the video game "Grand Theft Auto: San Andreas."  Applying Rogers, the court held that the use of a modified version of plaintiff's trademark was artistically relevant to the defendant's vision in

---

(…continued)
not rise or fall because of other, non-expressive uses, even promotional or outright commercial ones."  NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *36 n.18 (First Amendment still applied to video game's use of trademarked "Delta Force" insignia even where "Delta Force" logos appeared outside of the game altogether on promotional merchandise); see also Rogers, 875 F.2d at 999 (First Amendment applied to *Ginger and Fred* movie to protect the title and its reference to Ginger Rogers outside of the work's storyline itself).

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

6238549.11

1  re-creating a virtual, cartoonish depiction of portions of real-life Los Angeles.  Id. at 1100.  The

2  court also noted that for purposes of Rogers, it was irrelevant that the Play Pen was not "'iconic,'"

3  that the game was not "'about'" the Play Pen, or that the game could have been made without

4  using the Play Pen name and logo.  Id. at 1099, 1100.  Rather, the use was relevant to

5  "develop[ing] a cartoon-style parody of East Los Angeles" and, more specifically, to "recreat[ing]

6  a critical mass of the businesses and buildings," and creating the distinctive "look and feel" of East

7  Los Angeles.  Id. at 1100.  The use of the COD Monkey Patch in Ghosts to invoke the personal

8  identity of soldiers and the realistic "look and feel" of the military uniforms worn by the avatars in

9  the game is comparable to the use of a real-life logo to evoke virtual Los Angeles.

10  More recently, in Brown, professional football player Jim Brown brought trademark claims

11  against video game publisher Electronic Arts ("EA") arising from the use of his likeness in

12  Madden NFL, a football simulation video game.  In versions of that game, players could create

13  and manage an NFL franchise populated by game characters representing professional football

14  players.  Among the many game characters available to players was an avatar that was

15  recognizable as (but not identical to) plaintiff Jim Brown, including his jersey number, team

16  affiliation, physical attributes, playing position, and other attributes.  The Ninth Circuit found that

17  the use of elements of the plaintiff's likeness was justified by EA's effort to impart "extreme

18  realism" to the game, and "the '65 Cleveland Browns cannot be the '65 Cleveland Browns without

19  the players who played for the '65 Cleveland Browns.  This fundamental truth applies especially

20  to that team's most famous player, Jim Brown."  724 F.3d at 1243.  Thus:

> Given the acknowledged centrality of realism to EA's expressive goal, and the importance of including Brown's likeness to realistically recreate one of the teams in the game, it is obvious that Brown's likeness has at least some artistic relevance to EA's work. The fact that any given version of Madden NFL includes likenesses of thousands of different current and former NFL players does not impact this analysis.

25  Id.

26  Also highly analogous is Stewart Surfboards, Inc. v. Disney Book Group, LLC, 2011 U.S.

27  Dist. LEXIS 155444.  The plaintiff, a surfboard company, brought trademark and related claims

28  against the Disney Book Group arising from the defendant's use of an image of a Stewart

Surfboard trademark on the back cover of a book titled "Hannah Montana: Rock the Waves." The Court had little difficulty in finding (at the motion to dismiss phase, no less) that the use was artistically relevant to the book, which "tells the story of Miley Stewart's summer vacation in which her crush of the moment, an Aussie surfer, will be competing in a major surfing competition in her hometown and in which Hannah Montana is asked to perform at the competition's closing ceremonies." Id. at *13. Moreover, the Court noted, as is the case here, that the Stewart Surfboards trademark has "celebrity status in the surfing community" and thus "evokes the surfing theme that is reflected in the plot line of the book." Id. at *14. The Court also specifically rejected the plaintiff's argument that Stewart Surfboards trademark was not "necessary" to the work or that the work did not specifically offer commentary on the trademark itself. Id. at *17-*18. Rather:

> An artistic use of a trademark that is only minimally relevant to the underlying work is nonetheless an expressive use. Requiring that use to have more than minimal relevance to the underlying work to pass the 'artistic relevance' prong of the Rogers test would subject some expressive speech to the traditional likelihood-of-confusion test that does not adequately account for First Amendment interests. For this reason, only minimal artistic relevance – enough relevance to satisfy the Court that a use of a trademark is truly expressive, as opposed to a commercial use that simply uses the mark to exploit its publicity value – is necessary to satisfy the first Rogers prong. Moreover, courts are ill-equipped to make the artistic judgments as to precisely how important the use of a mark is to the message conveyed.

Id. at *18-*19.

Numerous courts, including the Ninth Circuit Court of Appeals, have come to the same or similar conclusions, in some cases finding that the first prong of Rogers was satisfied in circumstances where the "artistic relevance" of the use was more attenuated than it is here. See, e.g., Louis Vuitton, 868 F. Supp. 2d at 178-79 (use of a "knock-off" Louis Vuitton bag in "The Hangover: Part II" was artistically relevant); Dillinger, 2011 U.S. Dist. LEXIS 64006, at *14 ("Dillinger" trademark was not infringed by its use as the name of a weapon in a video game, even though the trademark bore only an "attenuated" relationship to the theme and purpose of the game, because Dillinger, "commonly known for his public persona as a 'flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns,' has above-zero relevance to a game whose premise enables players to act like members of the mafia and spray Tommy

1   Guns."); Roxbury, 669 F. Supp. 2d at 1176 ("Route 66" was artistically relevant to a sexually

2   explicit film about road trips, even though the film had nothing to do with the actual Route 66:

3   "Plaintiffs argument that the association is tenuous does not controvert Defendants' showing.").

4       Like the "Pig Pen" logo in ESS, or the plaintiff's likeness in Brown, or any of a number of

5   other examples, the inclusion of the COD Monkey Patch in Ghosts reflects an artistic decision that

6   was justified and appropriate given the nature of the game and its overall context.  Irrespective of

7   whether MSM agrees with the artistic choices that were made or whether the game could have

8   been made without the patch, there can be no dispute that the use has "above zero" relevance to

9   the game.

10          **2.      The Use Of The COD Monkey Patch In *Ghosts* Does Not Explicitly**

11                  **Mislead As To MSM's Sponsorship Or Endorsement Of The Product.**

12      "To be 'explicitly misleading,' the defendant's work must make some ***affirmative***

13   ***statement*** of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name

14   or other characteristic." Dillinger, 2011 U.S. Dist. LEXIS 64006, at *18 (emphasis added) (citing

15   Rogers, 875 F.2d at 1001); Rogers, 875 F.2d at 999 (giving as examples of "explicit" endorsement

16   the phrases "an authorized biography" or "Jane Fonda's Workout Book").  "It is key here that the

17   creator must *explicitly* mislead consumers." Brown, 724 F.3d at 1245 (emphasis in original).  "[I]t

18   is well-established that the use of a mark alone is not enough to satisfy this prong of the Rogers

19   test." Id.; see also Roxbury, 669 F. Supp. 2d at 1176 ("Mere use, without more, is insufficient to

20   make the use explicitly misleading."); E.S.S., 547 F.3d at 1100 (same); MCA, 296 F.3d at 902 (if

21   the use of a mark alone were sufficient, "it would render Rogers a nullity"); Dillinger, 2011 U.S.

22   Dist. LEXIS 64006, at *22 ("Plaintiff points to no *explicit* misrepresentation – that fact alone is

23   dispositive of this issue.") (emphasis in original).  "Rather, a work is 'explicitly misleading' only

24   if it contains an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that it is sponsored

25   by the trademark holder or about the trademarked thing." Stewart, 2011 U.S. Dist. LEXIS

26   155444, at *21.

27      There can be no dispute that *Ghosts* contains no such "explicit indication," "overt claim,"

28   or "explicit misstatement" that it is sponsored or endorsed by MSM.  As the Central District has

Mitchell
Silberberg &
Knupp LLP

6238549.11

18                    CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

recognized, "given the huge success of its 'Call of Duty' franchise, Activision understandably has made every effort to affirmatively negate any possible confusion regarding the source of [its games].'" <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *40.  Thus, as with the rest of the widely known *Call of Duty* franchise, *Ghosts*' packaging is clear as to its origin and source:  It states "CALL OF DUTY" in large white block letters as other games in the franchise do, and it prominently displays the logos of Activision and developer Infinity Ward.  <u>See</u> Miller Decl. ¶ 5, Exs. 1-2; <u>NovaLogic</u>, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *40-*41 ("For example, ['Call of Duty: Modern Warfare 3']'s packaging is very clear as to its origin and source.  It prominently displays the title 'CALL OF DUTY – MW3,' and identifies its makers as 'Activision,' and its affiliated studios, 'Infinity Ward' and 'Sledgehammer Games.'"); <u>see also</u> <u>Winchester Mystery House, LLC v. Global Asylum, Inc.</u>, 210 Cal. App. 4th 579, 592 (2012) (film not explicitly misleading where back cover of film displayed defendant's name and identified the film as a "MARK ATKINS" film); <u>Stewart</u>, 2011 U.S. Dist. LEXIS 155444, at *26 (book not explicitly misleading where "the book jacket and spine include the Disney logo, the 'Disney Press' logo, and the Disney channel logo").

Further, MSM is not mentioned on *Ghosts*' packaging, in its advertising, or within the game in any manner.  Activision has not claimed or suggested in any manner that it was made with the participation or endorsement of MSM.  <u>See</u> <u>NovaLogic</u>, 2013 U.S. Dist. LEXIS 188298, at *39 ("[I]t is undisputed that Activision does not explicitly misrepresent or in any manner affirmatively state to the public that Plaintiff is associated with, sponsored, endorsed, or otherwise is the source of ['Call of Duty: Modern Warfare 3'].  Specifically, there is nothing within MW3 or its packaging that could even arguably be considered explicitly misleading as to any sponsorship or endorsement by Plaintiff."); <u>Stewart</u>, at 2011 U.S. Dist. LEXIS 155444, at *26 ("The Hannah Montana book contains no such explicit misstatement that it is sponsored by or about Stewart Surfboards.  It does not say anything like 'Brought To You By Stewart Surfboards' or 'Presented By Stewart Surfboards,' nor does it indicate that it is a story about Stewart or his surfboards.").  Indeed, not only did Activision not use the COD Monkey Patch in a way that would meet the "explicitly misleading" test, a player may well not even know that the COD Monkey Patch is in

Mitchell
Silberberg &
Knupp LLP

6238549.11

19                                CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

the game until he or she purchases the game, plays the multiplayer mode, and either customizes a soldier using that particular patch (as opposed to any of the 600+ other patches in the game) or plays in a multiplayer match against another player who selects that patch. See Miller Decl. ¶ 12.[6]

Nor is any appearance of the COD Monkey Patch outside the game cause to strip First Amendment protection from *Ghosts*. The ***only*** appearance of the COD Monkey Patch outside the game is that it appears for a brief moment in a trailer for the multiplayer game mode, alongside several other patches and purely to demonstrate that customization feature of the game. See Miller Decl. ¶ 13 & Ex. 6. There can be no dispute that the trailer does not in any way expressly mislead as to MSM's involvement with or sponsorship of *Ghosts*; the trailer, like the game, does not in any way reference MSM, but rather prominently displays the white "CALL OF DUTY" logo along with the logos of Activision and Infinity Ward. In any event, even uses that are far more overtly promotional are encompassed within the Rogers test. See, e.g., Dillinger, 2011 U.S. Dist. LEXIS 64006, at *19 (no loss of First Amendment protection for game even where "press releases posted to EA's website listed the Modern Dillinger first among all the weapons"); Louis Vuitton, 868 F. Supp. 2d at 175 (no loss of First Amendment protection for movie even where handbag was shown in advertisements and trailers for "The Hangover: Part II"); Stewart, 2011 U.S. Dist. LEXIS 155444, at *2 (no loss of First Amendment protection for book where use of trademark on the back cover of the defendant's book was for the alleged purpose of "trad[ing] upon" plaintiff's goodwill); Hoffman v. Capital Cities/ABC, Inc., 255 F.3d 1180, 1186 (9th Cir. 2001) ("A printed article meant to draw attention [in a] for-profit magazine … does not fall outside of the protection of the First Amendment because it may help to sell copies."); see also n.5, supra.

The use of the COD Monkey Patch in *Ghosts*, then, is far from "explicitly misleading." As with various other video games including predecessors in the *Call of Duty* series, *Ghosts* is thus fully entitled to the protection of "the zone protected by the First Amendment," and summary

---

[6] Indeed, if there were any remaining doubt that the use of the COD Monkey Patch is not "explicitly misleading," it may be firmly put to rest by the fact that it is substantively ***different*** from the MSM Monkey Patch. See Brown, 724 F.3d at 1246-47 ("EA changed the jersey number on the Brown avatar from 32 (the number Brown wore in the NFL) to 37. If these changes had any impact on whether consumers believed that Brown endorsed the game, however, surely they made consumers *less* likely to believe that Brown was involved.").

1 | judgment is thus warranted for MSM's Lanham Act claims.  <u>MCA</u>, 296 F.3d at 900.

2

3 | **III.    MSM'S STATE LAW CLAIMS FOR UNFAIR COMPETITION AND "COMMON**

4 | **LAW" TRADEMARK INFRINGEMENT ALSO FAIL.**

5 | MSM's Fourth Claim for "Unfair Competition" and its Fifth Claim for "Common Law

6 | Trademark Infringement" are premised on the exact same facts as Plaintiff's analogous Lanham

7 | Act claims.  <u>See</u> Compl. ¶¶ 57-59 (incorporating earlier allegations and alleging that all damages

8 | are "by reason of the Defendants' actions alleged herein").  Accordingly, these claims similarly

9 | fail under the First Amendment <u>Rogers</u> test, and summary judgment should be granted as to those

10 | claims as well.  <u>See</u> <u>E.S.S.</u>, 547 F.3d at 1101 ("Since the First Amendment defense applies equally

11 | to [plaintiff's] state law claims as to its Lanham Act claim, the district court properly dismissed

12 | the entire case on [defendant's] motion for summary judgment."); <u>Walking Mountain</u>, 353 F.3d at

13 | 816 (affirming summary judgment on all trademark-related claims).

14

15 | <center>**<u>Conclusion</u>**</center>

16 | For the foregoing reasons, this Motion should be granted and summary judgment entered

17 | in Activision's favor on MSM's Second, Third, Fourth, and Fifth Claims.

18

19 | DATED:  October 16, 2014                 KARIN G. PAGNANELLI

20 |                                                            MARC E. MAYER
GILBERT S. LEE

21 |                                                            MITCHELL SILBERBERG & KNUPP LLP

22

23 |                                                            By:    /s/ Marc E. Mayer

24 |                                                                   Marc E. Mayer
Attorneys for Defendants

25 |                                                            ACTIVISION BLIZZARD, INC. and
ACTIVISION PUBLISHING, INC.

26

27

28

Mitchell
Silberberg &
Knupp LLP

6238549.11

21                           CASE NO. CV14-02361 RS
**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**