1  KARIN G. PAGNANELLI (SBN 174763) kgp@msk.com
   MARC E. MAYER (SBN 190969) mem@msk.com
2  GILBERT S. LEE (SBN 267247) gsl@msk.com
   MITCHELL SILBERBERG & KNUPP LLP
3  11377 West Olympic Boulevard
   Los Angeles, CA  90064-1683
4  Telephone:   (310) 312-2000
   Facsimile:   (310) 312-3100
5
   Attorneys for Defendants
6  ACTIVISION BLIZZARD, INC. and
   ACTIVISION PUBLISHING, INC.
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| MIL-SPEC MONKEY, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>ACTIVISION BLIZZARD, INC., a Delaware corporation; ACTIVISION PUBLISHING, INC., a Delaware corporation; and DOES 1 - 25, inclusive,<br><br>Defendants. | CASE NO. CV14-02361 RS<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ACTIVISION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF'S SECOND, THIRD, FOURTH, AND FIFTH CLAIMS FOR RELIEF**<br><br>Date:      November 20, 2014<br>Time:      1:30 p.m.<br>Judge:    Hon. Richard Seeborg<br>Courtroom:  3 – 17th Floor |
|---|---|

Mitchell Silberberg & Knupp LLP

CASE NO. CV14-02361 RS
**REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
6468966.13

# TABLE OF CONTENTS

                                              **Page**

Introduction ................................................................................................................................1

I.  BECAUSE *GHOSTS* IS AN EXPRESSIVE WORK, IT MERITS FIRST
    AMENDMENT PROTECTION AND FALLS WITHIN THE *ROGERS* TEST. ..............3

    A.    Like The Rest Of *Ghosts*, The Game's Multiplayer Mode Is Expressive
         And Thus Entitled To Full First Amendment Protection Under *Rogers*.................3

    B.    The Supposed "Commercial" Use Of The COD Monkey Patch In *Ghosts*
         Does Not Deprive The Game Of First Amendment Protection. .............................4

    C.    The *Rogers* Test Squarely Applies To The Use Of The COD Monkey
         Patch, Regardless Of Whether Any Monkey Patch Is "Iconic."..............................7

II. THE USE OF THE COD MONKEY PATCH IN *GHOSTS* CLEARLY
    SATISFIES BOTH PRONGS OF THE *ROGERS* TEST. ...................................................8

    A.    The First Prong Of *Rogers* Is Met Because The Use Of The COD
         Monkey Patch Has "Above Zero" Artistic Relevance To *Ghosts*. .........................9

         1.    "Artistic Relevance" Does Not Require That The Expressive
             Purpose Be Related In Some Manner To The Plaintiff, But
             Any Such Requirement Would Be Met Here Regardless. .........................9

         2.    Whether Morale Patches Are Authorized By The Military Or
             Are *In Fact* Worn In The Field Is Irrelevant. ............................................12

    B.    The Second Prong Of *Rogers* Is Met Because The Use Of The COD
         Monkey Patch In *Ghosts* Is Not "Explicitly Misleading." ....................................13

Conclusion................................................................................................................................15

Mitchell
Silberberg &
Knupp LLP

i                    CASE NO. CV14-02361 RS
**REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
6468966.13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Brown v. Electronic Arts, Inc.,
    724 F.3d 1235 (9th Cir. 2013) ............................................................................................. *passim*

Brown v. Entm't Merchants Ass'n,
    131 S. Ct. 2729 (2011) .................................................................................................................3

Campbell v. Acuff-Rose Music, Inc.,
    510 U.S. 569 (1994) .....................................................................................................................4

Daly v. Viacom, Inc.,
    238 F. Supp. 2d 1118 (N.D. Cal. 2002) .......................................................................................6

Dillinger, LLC v. Elec. Arts Inc.,
    No. 09-cv-1236, 2011 U.S. Dist. LEXIS 64006 (S.D. Ind. June 16, 2011) ....................... 6, 9, 13

Dita, Inc. v. Mendez,
    No. CV 10-6277, 2010 U.S. Dist. LEXIS 135856 (C.D. Cal. Dec. 10, 2010) ..........................12

E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.,
    547 F.3d 1095 (9th Cir. 2008) ............................................................................................. *passim*

Electronic Arts, Inc. v. Textron Inc.,
    No. C 12-00118, 2012 U.S. Dist. LEXIS 103914 (N.D. Cal. July 25, 2012) ............................14

ETW Corp. v. Jireh Publ'g, Inc.,
    332 F.3d 915 (6th Cir. 2003) ......................................................................................................15

Facenda v. N.F.L. Films,
    542 F.3d 1007 (3d Cir. 2008) .......................................................................................................6

Fortres Grand Corp. v. Warner Bros. Entm't, Inc.,
    947 F. Supp. 2d 922 (N.D. Ill. 2013), aff'd 763 F.3d 696 (7th Cir. 2014) ..................................9

Louis Vuitton Mallatier S.A. v. Warner Bros. Entertainment Inc.,
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ..........................................................................................6

Mattel, Inc. v. MCA Records,
    296 F.3d 894 (9th Cir. 2002) ......................................................................................... 5, 6, 7, 13

NovaLogic Inc. v. Activision Blizzard,
    -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298 (C.D. Cal. June 18, 2013) .................... *passim*

Parks v. LaFace Records,
    329 F.3d 437 (6th Cir. 2003) ............................................................................................... 11, 12

Rebelution, LLC v. Perez,
    732 F. Supp. 2d 883 (N.D. Cal. 2010) ................................................................................ *passim*

Mitchell Silberberg & Knupp LLP

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Rogers v. Grimaldi,
  875 F.2d 994 (2d Cir. 1989) ............................................................................................... *passim*

Roxbury Entm't v. Penthouse Media Grp., Inc.,
  669 F. Supp. 2d 1170 (C.D. Cal. 2009) ..................................................................................... 10

Stewart Surfboards, Inc. v. Disney Book Group,
  No. CV 10-2982, 2011 U.S. Dist. LEXIS 155444 (C.D. Cal. May 11, 2011) .................. 6, 8, 13

Univ. Money Ctrs., Inc. v. AT&T Co.,
  22 F.3d 1527 (10th Cir. 1994) .................................................................................................. 15

## Introduction

In opposing Activision's Motion for Partial Summary Judgment, Plaintiff Mil-Spec Monkey, Inc. ("MSM") completely ignores the Ninth Circuit's controlling caselaw, including the Ninth Circuit's decisions in <u>Brown v. Electronic Arts, Inc.</u>, 724 F.3d 1235 (9th Cir. 2013), and <u>E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.</u>, 547 F.3d 1095 (9th Cir. 2008), and the basic undisputed facts, which are evident from review of the game at issue and MSM's own allegations.  Instead, apparently realizing that the circumstances here are precisely what the Ninth Circuit held is protected by the First Amendment, MSM attempts to rewrite the law and import into the two-prong test from <u>Rogers v. Grimaldi</u>, 875 F.2d 994 (2d Cir. 1989) requirements that do not exist and contravene the purpose of that straightforward test.  Moreover, while disregarding the relevant Ninth Circuit authority, MSM relies almost exclusively on a single district court case – <u>Rebelution, LLC v. Perez</u>, 732 F. Supp. 2d 883 (N.D. Cal. 2010) – that predates the Ninth Circuit's decision in <u>Brown</u>, has not been followed for the propositions cited by MSM, and involved facts that are so different from those here that they actually confirm that the Rogers test applies and is met here.  When the correct two-prong <u>Rogers</u> test is applied, it is apparent that the use here – namely, the alleged incorporation of a real-life patch in an expressive work in a non-misleading manner and in furtherance of a coherent artistic vision – falls squarely within the protection of the First Amendment.

The litany of bite-sized arguments offered by MSM never coherently explain why the alleged use of the COD Monkey Patch in *Call of Duty: Ghosts* does not have "above zero" artistic relevance to the game or is "explicitly misleading."  The bulk of MSM's argument seems to be that because the MSM Monkey Patch is not "iconic," its use in *Ghosts* is not sufficiently expressive.  This mischaracterizes the law and misses the point.  There is no requirement in this circuit that for the First Amendment to apply, the trademark at issue must be "iconic" or have some cultural significance beyond its ordinary meaning.  All that is required is that the trademark be used in a manner that is artistically relevant to the expressive work.  To the extent that the law requires that the expressive use not be purely arbitrary and bear some relationship to the plaintiff, that is plainly the case here:  The COD Monkey Patch is one of many patches used in *Ghosts* that

1  collectively represent an authentic collection of morale patches, consistent with the universe of
2  morale patches available in the real world.  MSM concedes that the COD Monkey Patch is
3  popular, is of a type worn by members of the armed forces, and has been depicted on the arms and
4  rucksacks of members of the military.  In this regard, the use of the COD Monkey Patch is
5  precisely the type of use that the Ninth Circuit held in E.S.S. was artistically relevant in order to
6  create "critical mass" of patches and thus impart authenticity to the "look and feel" of *Ghosts*
7  fictional military world.

The remainder of MSM's arguments are equally without merit.  For example:

- MSM argues that *Ghosts* is not an expressive work and thus not entitled to First Amendment protection because its multiplayer mode does not include an overarching, scripted narrative.  This narrow view of the First Amendment is directly contrary to the caselaw and would result in the absurdity that a vast body of works such as poems, documentary films, and musical works would cease to be protected by the First Amendment.

- MSM argues that *Ghosts*, and the use of the COD Monkey Patch within *Ghosts*, is *pure* commercial speech (namely, advertising) because Activision sells additional downloadable content.  But the fact that Activision allows players to download new content for *Ghosts* does not make the game, or any of its component elements, "advertising," any more than a movie is an advertisement for its sequel.  Additionally, it is well-established that an expressive work does not become "pure commercial speech" or lose First Amendment protection just because it also attracts purchasers.

- MSM argues that the COD Monkey Patch is not "artistically relevant" to *Ghosts* because armed forces regulations prohibit the use of such morale patches in the field and thus, if the battles depicted in *Ghosts* were real, its fictional soldiers would not wear morale patches.  That argument would turn the Rogers test on its head, removing artistic discretion from the creators of the work and requiring that a court first evaluate whether a use is sufficiently "true to life" before according it protection.  That is not the law.

- MSM claims that the use is "explicitly misleading" because a 23-year-old blogger initially believed that the COD Monkey Patch might have been a custom patch made by MSM for

*Ghosts*.  Even if that were evidence of actual consumer confusion (which it is not, including because it did not result in any *marketplace* confusion), it is irrelevant to the Rogers analysis which denies First Amendment protection only if there is an "affirmative" or "overt" statement that *Ghosts* was sponsored by MSM, and there is plainly no such statement here.

For the reasons set forth in Activision's Motion and this Reply, the Motion should be granted and judgment entered on MSM's Second, Third, Fourth, and Fifth Claims for Relief.

## I. BECAUSE *GHOSTS* IS AN EXPRESSIVE WORK, IT MERITS FIRST AMENDMENT PROTECTION AND FALLS WITHIN THE *ROGERS* TEST.

MSM offers three arguments in an attempt to sidestep the Rogers test altogether.  None of them have any merit.

### A. Like The Rest Of *Ghosts*, The Game's Multiplayer Mode Is Expressive And Thus Entitled To Full First Amendment Protection Under *Rogers*.

MSM cannot seriously dispute that, as the Supreme Court and Ninth Circuit have consistently held, video games are speech and accorded full First Amendment protection.  See, e.g., Brown v. Entm't Merchants Ass'n, 131 S. Ct. 2729, 2733 (2011); Brown, 724 F.3d at 1241 ("The Supreme Court has answered with an emphatic 'yes' when faced with the question of whether video games deserve the same protection as more traditional forms of expression."). MSM identifies not a single case that has denied First Amendment protection to a video game such as *Ghosts*, let alone on the grounds that MSM advocates here.

MSM's attempt to divorce *Ghosts*' multiplayer mode from the rest of the game is without merit.  The test for whether a video game is an expressive work is not whether "the same literary devices [are] consistent throughout the single player campaign and the online multiplayer mode," nor whether certain game modes adhere to a predetermined plot.  Opp. at 21.  This type of argument has been firmly rejected by every court that has considered it, including the Ninth Circuit in Brown and E.S.S.  See Brown, 724 F.3d at 1241 (First Amendment and Rogers test applied "[e]ven if *Madden NFL* is not the expressive equal of *Anna Karenina* or *Citizen Kane*"); E.S.S., 547 F.3d at 1101 (First Amendment applied to *Grand Theft Auto* even if "players are free to ignore the storyline and spend as much time as they want at the Pig Pen").  Further, in claiming

that *Ghosts*' multiplayer mode is not sufficiently expressive or creative, MSM seeks to enmesh courts in the very guesswork that is antithetical to First Amendment protection of works. See, e.g., Brown, 724 F.3d at 1243 (the Rogers test is a "black-and-white rule [that] has the benefit of limiting our need to engage in artistic analysis in this context"); Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 582 (1994) ("'[I]t would be a dangerous undertaking for persons trained only in the law to constitute themselves final judges of the worth of [a work]....'"); NovaLogic Inc. v. Activision Blizzard, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *35 (C.D. Cal. June 18, 2013) ("The Rogers test is … very protective of speech.").

In any event, *Ghosts*' multiplayer mode has all of the hallmarks of an expressive work. It features detailed characters and environments. It contains music, sound effects, and voice acting. It also offers players a dynamic moment-to-moment gameplay experience, which is a type of storytelling no less worthy of protection than a scripted narrative. See Decl. of Yale Miller ¶ 5 & Ex. 1, ¶¶ 6, 8-12 & Ex. 5. See NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *29-*30 ("[B]ased on its compelling narrative and music, distinctive characters, how the players interact with the virtual environment as they complete a series of combat missions … , ['Call of Duty: Modern Warfare 3' including its multiplayer mode] is an expressive work entitled to as much First Amendment protection as any motion picture or any other expressive work."). *Ghosts*, even in multiplayer mode, is at least as expressive as the competitive virtual football matches at issues in the *Madden NFL* game in Brown, where, like here, "[e]very version of the game features characters (players), dialogue (between announcers), plot (both within a particular simulated game and more broadly), and music. Interaction between the virtual world of the game and individuals playing the game is prevalent." 724 F.3d at 1241-42.

B.   **The Supposed "Commercial" Use Of The COD Monkey Patch In *Ghosts* Does Not Deprive The Game Of First Amendment Protection.**

MSM next attempts to circumvent the First Amendment and the Rogers test by claiming that Activision's use of the COD Monkey Patch in *Ghosts* is purely "commercial" or "advertising" without any expressive purpose. See Opp. at 15-16, 23-24. The argument is disingenuous, if not outright frivolous. The fact that *Ghosts* – including the properties used in connection with the

1  game – is a commercial product that is intended to make money does not forfeit its First
2  Amendment protection.  If that were the case, then no for-profit film (like *Ginger and Fred*), nor
3  song (like *Barbie Girl*), nor video game (like *Grand Theft Auto* or *Madden NFL*), nor properties
4  associated with such works, could ever be entitled to First Amendment protection.

5  Meanwhile, as MSM acknowledges, the COD Monkey Patch has never been used in any
6  manner (other than its one-second appearance in the COD Multiplayer Trailer) to advertise,
7  promote, or otherwise exhort customers to purchase *Ghosts* or any downloadable content.  It is not
8  used on *Ghosts*' packaging, on retail displays, or on Internet or online banner advertisements.
9  Rather, what MSM claims is that *one way* to access downloadable content for *Ghosts* is within the
10 game, and a player may (but is not required to) scroll through existing patches before reaching
11 those that are "locked" and must be purchased.  See Opp. at 14.  Thus, as MSM acknowledges, the
12 COD Monkey Patch is not used to promote or advertise at all (far less have as their sole purpose to
13 advertise), but rather may be seen by a player – along with ***every other patch*** – before buying new
14 patches.  That is not pure commercial speech.  MSM's argument is equivalent to claiming that a
15 photograph in a magazine is an "advertisement" for later issues because the magazine also
16 contains a subscription card tucked into its pages, or that a scene a movie is an "advertisement" for
17 the movie's sequel or for tie-in merchandise.[1]

18 In any event, even if the presence of the COD Monkey Patch within *Ghosts* might
19 conceivably entice players to purchase additional content or drive interest in the product, "courts
20 have consistently held that First Amendment protection for expressive use does not rise or fall
21 because of other, non-expressive uses, even promotional or outright commercial ones."
22 NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *36 n.18.  Notably, in Rogers and
23 Mattel, the alleged use was as the ***title*** of the defendants' respective works – uses that are far more
24 overtly promotional.  As the Second Circuit explained in Rogers, "[t]he title of a movie may be

---

[1] That a player may purchase and download additional content from within the game software (rather than having to visit a separate online store) likewise does not make the game itself (or any of its content) a mere advertisement for additional content.  MSM does not cite any authority for this proposition, which would result in denying First Amendment protection for any website, video game, or online publication that contains links to additional content for sale.

1  both itself an integral element of the filmmaker's expression as well as a significant means of
2  marketing the film to the public.  The artistic and commercial elements of titles are inextricably
3  intertwined."  875 F.2d at 998; see also Mattel, Inc. v. MCA Records, 296 F.3d 894, 902 (9th Cir.
4  2002) ("A title is designed to catch the eye and to promote the value of the underlying work.").

5       It is equally well-established that the use of a trademark within advertising or promotional
6  material for an expressive work – including, such as here, a brief display of the mark in a "teaser"
7  trailer – will not affect the First Amendment analysis.  In Dillinger, LLC v. Elec. Arts Inc., No.
8  09-cv-1236, 2011 U.S. Dist. LEXIS 64006, at *19 (S.D. Ind. June 16, 2011), the defendant
9  actually posted to its website "press releases … list[ing] the Modern Dillinger first among all the
10 weapons," which was a far more significant promotional use than a flash of the COD Monkey
11 Patch in the COD Trailer.  Similarly, in Louis Vuitton Mallatier S.A. v. Warner Bros.
12 Entertainment Inc., 868 F. Supp. 2d 172, 175 (S.D.N.Y. 2012), the plaintiff's trademark was
13 shown in advertisements and trailers for "The Hangover:  Part II," and in Stewart Surfboards, Inc.
14 v. Disney Book Group, No. CV 10-2982, 2011 U.S. Dist. LEXIS 155444, at *2 (C.D. Cal. May
15 11, 2011), the trademark was on the back cover of the book, for the alleged purpose of "trad[ing]
16 upon" plaintiff's goodwill.  In a previous installment of *Call of Duty*, the use of a trademarked
17 logo (for the Delta Force) on promotional merchandise (headsets) did not extinguish First
18 Amendment protection, either.  See NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298,
19 at *36 n.18; Mattel, 296 F.3d at 899 (First Amendment applied even where "[d]efendants entered
20 into cross-licensing agreements and developed a coordinated plan to distribute … promotional
21 copies"); Daly v. Viacom, Inc., 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (First Amendment
22 barred misappropriation claim even where plaintiff's likeness was used in "advertisements for the
23 program").[2]  In short, the alleged use of the defendant's trademark in promotional material for an
24 expressive work does not strip First Amendment protection for the work.

---

[2] Facenda v. N.F.L. Films, 542 F.3d 1007 (3d Cir. 2008), aside from being out-of-circuit authority, is not on point.  It did not concern a video game, but rather the use of the plaintiff's voice in a film whose *only* purpose was to advertise the game *Madden Football* and which the court characterized as an "infomercial," not "close to th[e] boundary" between commercial and noncommercial speech."  Id. at 1017-18.  Notably, in Facenda, the plaintiff's (trademarked) voice was *not* in the actual game, but was used by taking other footage and incorporating it into the film

(…continued)

C.  **The *Rogers* Test Squarely Applies To The Use Of The COD Monkey Patch, Regardless Of Whether Any Monkey Patch Is "Iconic."**

In lieu of squarely or coherently addressing the two prongs of the well-established Rogers test, MSM attempts to inject a third element into that test: namely, that the trademark must be a "cultural icon" or be imbued with some meaning outside its meaning within the marketplace. That is not the law. MSM derives this "cultural icon" argument entirely from *dicta* in Mattel – which predates later circuit precedent in E.S.S. and Brown – and from a single district court decision that likewise predates Brown, Rebelution, LLC v. Perez, 732 F. Supp. 2d 883 (N.D. Cal. 2010).

MSM's "cultural icon" argument was made by the plaintiff in E.S.S. (citing Mattel, no less), and it was squarely rejected by the Ninth Circuit, which in its later seminal First Amendment cases has never imposed such a requirement. Contrary to MSM's assertion that the court in E.S.S. "did not consider whether the public had imbued the plaintiff's mark with any expressive meaning," Opp. at 18, the Ninth Circuit specifically held that the First Amendment applied even though, "unlike the Barbie case, where the trademark and trade dress at issue was a cultural icon (Barbie), ***the Play Pen is not a cultural icon***" and "***has little cultural significance***." 547 F.3d at 1100 (emphases added). Likewise, in Brown the defendant never claimed that the mark (Jim Brown's likeness) was iconic or had some broader cultural significance or meaning other than as a reference to the plaintiff himself. See 724 F.3d at 1239. Thus, the Ninth Circuit never discussed this issue and never imposed any such requirement when it held that the Rogers test applied and the use was artistically relevant.

Requiring that a mark be "iconic" before its use is entitled to First Amendment protection would remove from protection an entire body of uses that clearly are protected and intended to fall within the test, such as a "critical mass" of signs, logos, buildings, and products, all individually having "little cultural significance," but which combine to "recreate" a particular "look and feel" or impart a sense of authenticity to the world being depicted. E.S.S., 547 F.3d at 1100. As the Central District explained:

---

(…continued)
at issue. That is in stark contrast to the situation here, where the COD Monkey Patch quickly flashes in a trailer only because it *also* appears in *Ghosts* and as a demonstration of gameplay.

Mitchell Silberberg & Knupp LLP
6468966.13

> the reasoning underlying the Rogers decision makes clear that the test should apply equally to all marks, *regardless of their cultural significance*…. The court explained that "the expressive element of titles requires more protection than the labeling of ordinary commercial products." Thus, the Rogers court was concerned that the traditional likelihood-of-confusion test for trademark infringement claims, when applied to speech with expressive elements, threatened to "intrude on First Amendment values." To eliminate this threat, the Rogers court adopted its test for artistic uses of trademarks. Such uses deserved greater protection not because the marks enjoyed broad cultural significance, but rather because they were expressive uses entitled to full First Amendment protection. Expressive speech containing references to cultural icons with broad public recognition does not enjoy any greater First Amendment protection than expressive speech making only obscure references. ***Thus, there is no basis for applying the Rogers test only when the expressive or artistic speech makes reference to culturally significant marks***.

Stewart Surfboards, 2011 U.S. Dist. LEXIS 155444, at *10-*11 (citations omitted; emphases added). By contrast, Rebelution's suggestion that the trademark be "iconic" is inconsistent with E.S.S. and certainly no longer good law after Brown.[3] Indeed, Rebelution has not been followed for this proposition since Brown was decided. Accordingly, there is no reason for the Court to import this third, "iconic" requirement into the Rogers test, irrespective of Rebelution. See generally NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298 (applying Rogers to *Call of Duty* game without imposing additional "cultural icon" requirement).

## II. THE USE OF THE COD MONKEY PATCH IN *GHOSTS* CLEARLY SATISFIES BOTH PRONGS OF THE *ROGERS* TEST.

MSM never squarely or coherently addresses the two prongs of the Rogers test in its Opposition. In fact, MSM never even *mentions* Brown and discusses E.S.S. only in passing. But the two-prong Rogers test is well-established in this Circuit and has been clearly articulated by E.S.S. and Brown: "An artistic work's use of a trademark that otherwise would violate the Lanham Act is not actionable 'unless [1] the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, [2] if it has some artistic relevance, unless [it] explicitly misleads

---

[3] Judge Patel's comment in Rebelution, relied on by MSM (Opp. at 18), that the parties in E.S.S. conceded the applicability of the Rogers test (732 F. Supp. 2d at 888) does not support MSM's "cultural icon" requirement. The plaintiff in E.S.S. made the exact same argument that MSM makes here, and the Ninth Circuit squarely rejected it.

as to the source or the content of the work.'" E.S.S. 547 F.3d at 1099; see also Brown, 724 F.3d at 1241-42 (affirming the Rogers "two-pronged" test).  This test plainly is met here.

      A.    **The First Prong Of *Rogers* Is Met Because The Use Of The COD Monkey Patch Has "Above Zero" Artistic Relevance To *Ghosts*.**

           1.    **"Artistic Relevance" Does Not Require That The Expressive Purpose Be Related In Some Manner To The Plaintiff, But Any Such Requirement Would Be Met Here Regardless.**

MSM claims primarily that the COD Monkey Patch lacks artistic relevance to *Ghosts* because such use does not relate to some "expressive meaning associated with the mark by the public."  Opp. at 5; see also Opp. at 21-22 (arguing that Activision must demonstrate "the existence of any meaning associated with MSM's Angry Monkey Mark").[4]  MSM's argument – for which it fails to cite any Ninth Circuit authority – misconstrues the law.  As the Ninth Circuit has repeatedly made clear, the Rogers test requires only that "the level of [artistic] relevance [of the mark at issue] *merely must be above zero*," not that the use must be directly related to some broader public meaning associated with the mark.  E.S.S., 547 F.3d at 1100 (emphasis added); Brown, 724 F.3d at 1243 (same).  The only authority cited by MSM for its "association" argument – Rebelution – has been criticized as an "outlier" that misapplied Rogers.  See Fortres Grand Corp. v. Warner Bros. Entm't, Inc., 947 F. Supp. 2d 922, 934 n.2 (N.D. Ill. 2013) ("Rebelution's holding narrowly reads the 'artistic relevance' prong of the Rogers test as requiring defendant's use 'to be with reference to the meaning associated with plaintiff's mark.'  *This holding seems to be an outlier, as other courts have not required nearly so narrow a reading of the first prong of the Rogers test*.") (emphasis added; citation omitted), aff'd 763 F.3d 696 (7th Cir. 2014).  Consistent with this circuit's "merely above zero" requirement, courts have found artistic relevance even where the relationship between the defendants' use and the plaintiff is extremely attenuated, and even where the only purpose of the use is to refer to the mark's ordinary meaning in the marketplace.  See, e.g., Dillinger, 2011 U.S. Dist. LEXIS 64006, at *14 ("Dillinger"

---

[4] MSM briefly suggests (Opp. at 16) that the Rogers test applies only to the use of trademark as titles, but that is clearly not the law.  See E.S.S., 547 F.3d at 1099 ("Although [the Rogers] test traditionally applies to uses of a trademark in the title of an artistic work, there is no principled reason why it ought not also apply to the use of a trademark in the body of the work.").

1  trademark bore only an "attenuated" relationship to the theme and purpose of the game); Roxbury

2  Entm't v. Penthouse Media Grp., Inc., 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) ("Route 66"

3  was artistically relevant to a sexually explicit film about road trips, though the film had nothing to

4  do with the actual Route 66 or the plaintiff's television show: "Plaintiffs argument that the

5  association is tenuous does not controvert Defendants' showing.").

6       Even applying MSM's restrictive (and incorrect) interpretation of Rogers, the COD

7  Monkey Patch here is more than sufficiently related to MSM to constitute "above zero" artistic

8  relevance.  Importantly, MSM admitted in its Complaint, and does not retreat from the allegation,

9  that morale patches (including MSM's Monkey Patch) are "popular among military personnel and

10 are often worn in unofficial contexts to allow the wearer to express a sense of personal …

11 identity," and the MSM Monkey Patch in particular is "one of MSM's most popular morale

12 patches."  Compl. ¶¶ 14-15, 18.  MSM also does not dispute that the use of the COD Monkey

13 Patch fits logically into the military fantasy setting of *Ghosts*, that it is of a type and nature that a

14 member of the armed forces might wear, and, perhaps most critically, that the morale patches

15 offered in *Ghosts* serve to imbue to the individual a sense of personal identity, just as do actual,

16 real-life morale patches.  In fact, MSM's own purported "expert" argues that the use of military

17 patches in *Ghosts* is consistent with other artistic decisions in *Ghosts* (and *Call of Duty* more

18 generally) concerning the use of realistic military gear and that MSM's tactical gear is well-known

19 and widely available.  Decl. of Richard W. Graves ¶¶ 5-10.  Mr. Graves even admits that the COD

20 Monkey Patch was such a good artistic decision that when he plays the game "I usually select the

21 [COD Monkey Patch] as the patch to be worn by my in-game avatar and to represent me during

22 online multiplayer gameplay," id. ¶ 19, notwithstanding his purported knowledge that the patch is

23 not sponsored by or affiliated with MSM.  *Ghosts*' use of morale patches is not arbitrary, but

24 reflects the diversity and themes present in morale patches, including those offered by MSM.

25      In light of the foregoing, there can be little dispute that the use of the COD Monkey Patch

26 in *Ghosts* meets the lenient "merely above zero" standard for artistic relevance, as comparison to

27 other cases make clear.  In E.S.S., the Ninth Circuit found that the "only way, and certainly a

28 reasonable way" to develop its vision of downtown Los Angeles was to include "a critical mass of

1  businesses and buildings that constitute it," among them a "strip club that is similar in look and
2  feel to the Play Pen."  547 F.3d at 1100.  Just as in E.S.S., it was a perfectly reasonable artistic
3  decision to include a "critical mass" of patches in *Ghosts* that contribute to the overall "look and
4  feel" of the game which portrays a military fantasy.  As part of rendering this military fantasy in a
5  convincing and authentic manner, it was reasonable to depict the types of patches that one might
6  expect to find in the real world, including a patch of a chimpanzee such as that worn by real-life
7  soldiers (such as the soldiers and other military personnel that MSM depicts on its website).  This
8  decision is consistent with the "particularized reality" that the Central District has found
9  characterizes the *Call of Duty* franchise and warrants First Amendment protection.  See
10 NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *36 (in *Call of Duty:  Modern*
11 *Warfare 3*, the "use of the phrase 'Delta Force' and the MW3 Delta Force Logo gives users of
12 MW3 a sense of particularized reality of being part of an actual elite special forces operation and
13 serve as a means to increase specific realism of the game" and "help satisfy the ever increasing
14 demand for 'authentic simulation' in video games … which undoubtedly accounts for its
15 enormous success").  See also Brown, 724 F.3d at 1243 (use of professional football players was
16 relevant to game involving competitive football matches:  "Given the acknowledged centrality of
17 realism to EA's expressive goal, and the importance of including Brown's likeness to realistically
18 recreate one of the teams in the game, it is obvious that Brown's likeness has at least some artistic
19 relevance to EA's work.  The fact that any given version of *Madden NFL* includes likenesses of
20 thousands of different current and former NFL players does not impact this analysis.").
21         MSM's reliance on Rebelution and Parks v. LaFace Records, 329 F.3d 437 (6th Cir. 2003)
22 is misplaced, and actually confirms that "above zero" artistic relevance is present here.  In
23 Rebelution, unlike here, the defendant was unable to articulate ***any*** relationship whatsoever
24 between his use and the plaintiff's mark; instead, he conceded that the "Rebelution" mark in
25 question was "a made-up word that is an amalgamation of some subset of the words rebel,
26 revolution and evolution," and "[i]mportantly, nowhere does [he] claim that defendants' use refers
27 to plaintiff or the reggae band Rebelution."  732 F. Supp. 2d at 889.  Likewise, in Parks – a Sixth
28

Circuit decision that predates E.S.S. and Brown and is of dubious worth in this circuit[5] – the court's conclusion was based on its finding that "Defendants' lyrics … contain *absolutely nothing* that could conceivably, *by any stretch of the imagination*, be considered, explicitly or implicitly a reference to courage, to sacrifice, to the civil rights movement or to any other quality within which Rosa Parks is identified." 329 F.3d at 453-54 (emphases added). Here, however, MSM specifically alleges that the morale patches depicted in *Ghosts*, including the COD Monkey Patch, evoke the real-world use of its physical patches. Thus, MSM does not and cannot claim that the COD Monkey Patch has "absolutely" no relationship to MSM "by any stretch of the imagination."[6] The "above zero" artistic relevance is apparent.

### 2. Whether Morale Patches Are Authorized By The Military Or Are *In Fact* Worn In The Field Is Irrelevant.

The remainder of MSM's argument on artistic relevance seems to be that the use of morale patches on *Ghosts*' virtual soldiers is not true-to-life because morale patches are not sanctioned by the military and thus are not typically worn when in battle or in the field. See Opp. at 9-10. MSM goes so far as to include in its papers dozens of pages of Army, Navy, Air Force, and Coast Guard regulations, apparently suggesting that *Ghosts*' virtual soldiers would be violating these regulations by wearing morale patches when they engage in make-believe combat against other virtual soldiers. See Decl. of Patrick Lundell Exs. F-L. The argument misses the point. The "artistic relevance" test does not require that the use be perfectly realistic. All that is required is that there be *artistic* relevance and that such relevance be "***above zero***." That test is designed to place artistic decisions in the hands of the creator, not the Court or the trademark owner.

---

[5] The Sixth Circuit's reasoning in Parks is highly questionable. Specifically, in finding that it "would not be unreasonable to conclude that the title *Rosa Parks* is *not* relevant to the song in question" (329 F.3d at 453, emphasis in original), the Parks Court engaged in precisely the type of subjective artistic analysis prohibited by Brown. See 724 F.3d at 1243 (the "above zero" test is a "black-and-white rule [that] has the benefit of limiting our need to engage in artistic analysis in this context."). Accordingly, Parks should not be considered persuasive authority in this circuit.

[6] MSM cites Dita, Inc. v. Mendez, No. CV 10-6277, 2010 U.S. Dist. LEXIS 135856 (C.D. Cal. Dec. 10, 2010). Dita is inapposite because the defendant's use of the "DITA" name had no expressive purpose whatsoever. Instead, the defendant used its confusingly similar "DITA" mark purely to brand its T-shirts, jewelry, leather goods, and clothes, ostensibly because the defendant was known professionally as "Dita de Leon."

The creators of *Ghosts*, a fictional portrayal of near-future warfare, were entitled to make artistic and design decisions with respect to their entertainment product, including decisions as to the extent to which the portrayal is or is not realistic. Were it otherwise, then the defendants in E.S.S. would not have been able to name their fictional strip club the "Pig Pen," since the club's real name was the "Play Pen." Nor could the defendant in Brown replace the plaintiff's jersey number with a different number or allow him to play on a team other than the Cleveland Browns. The defendant in Dillinger would not have been able to name its weapon the "Dillinger," because John Dillinger was not alive during the years in which "The Godfather" movies were set. See Dillinger, 2011 U.S. Dist. LEXIS 64006, at *11-*12 (rejecting the plaintiff's challenge that "John Dillinger himself appears nowhere in the *Godfather* novel, movies, or video game story line" and was not alive during the period which any of those works was set.").

### B. The Second Prong Of *Rogers* Is Met Because The Use Of The COD Monkey Patch In *Ghosts* Is Not "Explicitly Misleading."

As for Rogers' second prong, MSM acknowledges, and the cases make absolutely clear, that the "explicitly misleading" test requires an *affirmative* and *overt statement* on the part of the defendant that indicates a relationship with or endorsement by the plaintiff. See, e.g., Rogers, 875 F.2d at 999 (giving as examples of "explicit" endorsement the phrases "an authorized biography" or "Jane Fonda's Workout Book"); Mattel, 296 F.3d at 902 (Rogers test satisfied because the song "does not, explicitly or otherwise, suggest that it was produced by Mattel"); Stewart Surfboards 2011 U.S. Dist. LEXIS 155444, at *21 ("[A] work is 'explicitly misleading' only if it contains an 'explicit indication,' 'overt claim,' or 'explicit misstatement' *that it is sponsored by the trademark holder or about the trademarked thing*.") (emphasis added); Dillinger, 2011 U.S. Dist. LEXIS 64006, at *22 ("Plaintiff points to no *explicit* misrepresentation – that fact alone is dispositive of this issue.") (emphasis in original). Thus, the mere fact that the work at issue contains the trademark – even if the use is "prominent" (which it is not) and even if there are alleged "similarities" (Opp. at 5) – does not make the use *explicitly* misleading. Where "[t]he *only* indication that [plaintiff] might be associated with the [work] is the use of the [trademark at issue]," that does not amount to *explicitly* misleading use. Mattel, 296 F.3d at 902 (emphasis in

1  original). Accordingly, even if the presence of the COD Monkey Patch *might* cause some

2  consumers to be confused into believing that the COD Monkey Patch was a licensed version of

3  MSM's Monkey Patch, that does not make the use explicitly misleading.[7]

4  Beyond the bare use of the COD Monkey Patch, MSM never explains what conceivably

5  "explicitly misleading" claims or misstatements Activision engaged in. There are none. MSM

6  concedes that *Ghosts* never once refers to MSM, but instead prominently features the brand names

7  "ACTIVISION" and "INFINITY WARD" on its packaging. That branding is consistent with "the

8  huge success of its 'Call of Duty' franchise" and the fact that "Activision understandably has

9  made every effort to affirmatively negate any possible confusion regarding the source of" its

10 games. NovaLogic, -- F. Supp. 2d --, 2013 U.S. Dist. LEXIS 188298, at *40. MSM also

11 concedes that the COD Monkey Patch is different from MSM's Monkey Patch. See Graves Decl.

12 ¶ 18 (characterizing the COD Monkey Patch as "digitally altered"). Moreover, MSM's blogger

13 and own purported "expert" notes that his alleged confusion was not based on any statement or

14 claim made by Activision, but was based simply on the supposed similarity of the designs and his

15 own *belief* of Activision's licensing practices, drawn from the issuance of a press release for a

16 different game for the use of a design in that game. See Graves Decl. ¶ 5 ("My understanding

17 [that HyperStealth licensed their camouflage pattern] is based, in part, on my knowledge of a press

18 release…."). No such statements or press releases were issued connecting MSM to *Ghosts*.[8]

19 Finally, it is well-established that evidence of consumer confusion is irrelevant, even

20 where (unlike here) the evidence is significant. For example, in Rogers, the court gave no weight

---

[7] The *only* case that MSM cites in support of its "explicitly misleading" argument is Electronic Arts, Inc. v. Textron Inc., No. C 12-00118, 2012 U.S. Dist. LEXIS 103914 (N.D. Cal. July 25, 2012). But that decision concerned a motion to dismiss. The court did not take judicial notice of the game itself, and specifically noted that it was required to accept as true Textron's allegations that, for example, the plaintiff "entices consumers to purchase [the game] specifically by advertising the AH-1Z," the plaintiff "promoted use of the Bell-Manufactured Helicopter to consumers," and the plaintiff "deliberately and willfully used and continues to use [the marks] … *to deceive consumers*." Id. at *10 (emphasis added).

[8] In his declaration, Mr. Graves also references a YouTube video with in-game footage of *Ghosts*' multiplayer mode. Graves Decl. ¶ 16. There is no evidence that the video was created or posted by Activision (it appears to have been posted by anonymous user "drift0r"), and in any event it merely contains footage of the game being played, not advertising. Nor does Graves suggest that the COD Monkey Patch was discussed or displayed during any "live event." Graves Decl. ¶ 15.

to the plaintiff's survey evidence (reflecting that 38% of 201 respondents believed that the plaintiff had something to do with the film), noting that "even if its validity is assumed, [the survey] indicates at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film."  Rogers, 875 F.2d at 1001.  In Brown, the Ninth Circuit likewise remarked that "[e]ven if Brown could offer a survey demonstrating that consumers of the *Madden NFL* series believed that Brown endorsed the game, that would not support the claim that the use was explicitly misleading to consumers."  724 F.3d at 1246.  See also ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 937 (6th Cir. 2003) (finding survey evidence irrelevant).  As a result, the Court need not even consider MSM's only purported evidence of "actual confusion," which is the self-serving testimony of a blogger who anecdotally claims that when he first encountered the COD Monkey Patch he thought that it might have been licensed by MSM.[9]  MSM therefore falls well short of demonstrating anything *explicitly* misleading about the COD Monkey Patch.

## Conclusion

For the foregoing reasons, this Motion should be granted and summary judgment entered in Activision's favor on MSM's Second, Third, Fourth, and Fifth Claims.[10]

DATED:  November 6, 2014                    MITCHELL SILBERBERG & KNUPP LLP

By:   /s/ Marc E. Mayer
          Attorneys for Defendants

---

[9] Even if this testimony were evidence of confusion, it is the type of *de minimis* confusion that courts have held do not support a likelihood of consumer confusion.  See Univ. Money Ctrs., Inc. v. AT&T Co., 22 F.3d 1527, 1535 (10th Cir. 1994).  Moreover, Mr. Graves never suggests that his purchasing decision was at all motivated by the presence of the COD Monkey Patch.

[10] As Activision argued (Mot. at 21) and MSM does not dispute, the Rogers test applies equally to the state law claims for relief.