UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIL-SPEC MONKEY, INC., <br><br> Plaintiff, <br><br> v. <br><br> ACTIVISION BLIZZARD, INC., et al., <br><br> Defendants. | Case No. 14-cv-02361-RS <br><br> **ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## I.  INTRODUCTION

In this action arising from claims of copyright and trademark infringement, plaintiff Mil-Spec Monkey, Inc. ("MSM") avers that the video game *Call of Duty: Ghosts*, created and published by defendant Activision Publishing, Inc. and Activision Blizzard, Inc. (collectively, "Activision")[1] makes illicit use of MSM's "angry monkey" trademark, among the most popular morale patch designs the company promotes and sells online and through third parties. Activision, which bears no relationship to MSM, includes in *Ghosts* an image visually similar to MSM's "angry monkey" mark as a patch players may select to place on their avatars' uniforms in its multi-player game mode. When selected by players, the *Ghosts* "angry monkey" patch appears at various points during game play. It moreover appears in Activision's pre-release promotional trailer for *Ghosts*' multi-player edition.

---

[1] Defendants contend that Activision Publishing, Inc., and not its parent company Activision Blizzard, Inc., bears responsibility for publishing and marketing *Ghosts*.

MSM brings five claims against Activision, alleging (1) copyright infringement; (2) trademark infringement under the Lanham Act; (3) false designation of origin; (4) California statutory unfair competition; and (5) common law trademark infringement. The last four claims, MSM avers, arise from consumer confusion as to the source, affiliation, and sponsorship of the "angry monkey" patch in the *Ghosts* video game. According to MSM, Activision's sole purpose for including such a patch in its game is deceitfully to play upon MSM's renown and goodwill in the marketplace and thereby earn unjust riches. Activision's present motion for partial summary judgment seeks a ruling in its favor on all of MSM's claims save its copyright infringement claim, on the sole contention that its use of MSM's "angry monkey" mark is protected by the First Amendment. Because *Ghosts* is an expressive work, and its disputed design bears some level of artistic relevance to the game and is not explicitly misleading—meeting both prongs of the test set forth originally in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and adopted by the Ninth Circuit—Activision's motion must be granted.

## II. BACKGROUND

### A. MSM and the "Angry Monkey" Morale Patch Design.[2]

MSM is a military supply and outfitting company that specializes in the design and creation of unofficial military morale patches. A morale patch, as MSM defines it, is any wearable patch that military personnel are not authorized to wear or are strictly prohibited from wearing. According to MSM, members of the military frequently wear morale patches in unofficial contexts to express a sense of personal identity. Its morale patch bearing the disputed "angry monkey" mark is one of MSM's most well-known and popular patch designs.

MSM has since at least 2007 been selling a variety of "angry monkey" patches through its

---

[2] MSM objects to the introduction of evidence from webpages and book excerpts lodged in support of Activision's motion as exhibits to the Declaration of Mark E. Mayer as lacking proper authentication under Federal Rule of Evidence 901. (Opposition, p. 2 n.1; p. 8 n.7.) Activision's motion refers to these sources to define morale patches; describe their usage and purpose; demonstrate that a variety are for sale across a range of Internet websites; and to offer the Court depictions of soldiers wearing such patches. (Mayer Decl., Exhibits 7-18.) Activision having offered no reply to these objections, they are sustained and the exhibits disregarded.

website and online store, in addition to promoting it online, at tradeshows, and via broad distribution of printed and electronic promotional materials. The Complaint depicts eleven "angry monkey" patches, in different color schemes, currently advertised for sale on MSM's website. MSM has registered its the mark with the United States Patent and Trademark Office for use in connection with its online store including clothing, patches, t-shirts, hats, bags and pouches and tactical gear. From MSM's "extensive use and promotion of its Angry Monkey Mark," the company avers, "such mark enjoys considerable goodwill, widespread recognition, and secondary meaning in commerce, and has become associated with MSM as its single source of origin." (Compl. ¶ 63.)

B. Activision and *Call of Duty: Ghosts*.

Activision designs, publishes, and distributes video games, including the highly successful *Call of Duty* series. *Call of Duty*'s military action fantasy games allow each player to assume the role of a military soldier and battle other players or a computer-controlled opponent to complete different missions on the game's digital battlefields. *Novalogic, Inc. v. Activision Blizzard*, 2013 WL 8845232, *2 (C.D. Cal. June 18, 2013). The original *Call of Duty* was released in 2003, followed by *Call of Duty 2, Call of Duty 3, Call of Duty 4: Modern Warfare, Call of Duty: World at War, Call of Duty: Modern Warfare 2, Call of Duty: Black Ops, Call of Duty: Modern Warfare 3,* and *Call of Duty: Black Ops 2*.

*Ghosts*, released in November 2013, is Activision's tenth installment in the series.[3] Like its predecessors, *Ghosts* depicts highly realistic combat in a near-future, war-torn setting, featuring numerous characters, complex narratives, and advanced graphics. Its main protagonists are the Ghosts—a force of U.S. Special Operations personnel trained to conduct secret missions behind enemy lines. The game's premise is that, following the nuclear destruction of the Middle East,

---

[3] The Court had the opportunity to review the retail copy of *Ghosts* Activision lodged as Exhibit A to the Miller Declaration. In addition, Exhibits 3, 4, 5, and 6 depict footage of game play and trailers advertising the game. Those showing multi-player mode contain clips that capture use of a design similar to MSM's "angry monkey" mark. As parties have pleaded, it appears as a patch players in multi-player mode can select to customize their characters, and pops up onscreen for various purposes throughout game play.

oil-producing nations in the Americas have formed an alliance known as "The Federation" that now poses a global threat against whom players must complete various missions. It incorporates dozens of contemporary weapons and vehicles that players can customize with modifications or attachments, and a variety of military equipment based on real-life counterparts or portrayals of future designs. The game also incorporates names and insignia of contemporary forces such as the National Security Agency, the United States Marine Corps, and the United States Air Force.

*Ghosts* features several game modes, including a single-player campaign with a predetermined plot, and various online multi-player modes in which participants can both collaborate as "squads" and compete against one another. Participants in multi-player mode can engage in combat on a number of different "maps" including geographic locations like the Gulf of Mexico, San Diego, the Caribbean, Antarctica, Venezuela, Brazil, and outer space; downloadable content offers players even more maps from which to choose. A new feature introduced by Activision is the option for gamers in multi-player mode to customize their soldier avatars by making selections from an extensive menu of options, including gender, uniform style, gear, accessories, and patches that may be worn on players' uniforms. Players are not, however, required to view or use any of these customization options to set up an avatar for a multi-player game.

C. The "Angry Monkey" Morale Patch in *Ghosts.*

Players using the customization menus in multi-player mode may select from a total of over six hundred patches to place on their avatars' uniforms. Thirty-two "standard-issue" patches are available at the start of the game; more become "unlocked" as rewards for players who complete objectives and missions. Additional patches are also available as downloadable content. (Miller Decl. ¶ 10.) The patches depict small cartoon images or icons inside a geometric shape, often with a customizable background. They appear onscreen at various points during multi-player matches, when a player may glimpse a patch on the uniform of another player, or alongside a flash of the name of an avatar wearing a patch who just performed a particular objective in the ongoing mission. The patches also appear alongside other player information in match

ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT
CASE NO. 14-cv-02361-RS
4

"summaries," displayed onscreen at the conclusion of a match to detail each player's performance. (Miller Decl., Exhibit 5.) Patches players select to place on their avatars thus serve to identify these characters throughout game play.

The *Ghosts* "angry monkey" patch appears to players in the in-game menu of avatar-customizing options as one of the "standard-issue" thirty-two patches available to all players in multi-player mode at the start of the game; it does not appear at all in the game's single-player mode. Because no player must use the customization tools or choose the "angry monkey" patch—and patches only appear onscreen as described above—it is possible for the disputed mark never to appear during game play, or not for many matches or hours.

Outside in-game menus and game play itself, *Ghosts*' "angry monkey" patch appears in Activision's official pre-release trailer for the multi-player version of the game. The design is visible for about 2 seconds as a small image at the bottom of the screen, associated with an avatar. Several other patches simultaneously appear below other avatars, to illustrate the game's avatar-customizing features and "squad"-based collaborative game play option. (Miller Decl., Exhibit 6.) Neither any version of the patch nor any logo or script that indicates an association with MSM appears in this trailer or on the retail game cover. (Miller Decl., Exhibits 2, 6.)

MSM alleges that Activision "willfully" makes use of the "angry monkey" mark "so as to cause confusion or mistake or to deceive consumers" "as to the source, affiliation, or sponsorship of the . . . design" and thereby take advantage of MSM's brand and relationship with consumers. (Compl. ¶¶ 33-34.) Activision now moves for partial summary judgment against MSM on its four claims grounded in trademark protection, solely on the theory that *Ghosts*' avail of the disputed "angry monkey" design is protected by the First Amendment.

### III. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a

material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.,* 164 F.3d 1218, 1225 (9th Cir. 1999*).* The Court must assume the truth of direct evidence set forth by the party opposing the motion. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). Where circumstantial evidence is presented, however, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson,* 477 U.S. at 249-50*.* While the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group v. American International Bank,* 926 F.2d 829, 836-37 (9th Cir. 1991). In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party will have the burden of proof at trial, however, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir.1996). The nonmoving

party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. at 323.

### IV. DISCUSSION

A. <u>*Ghosts* Is An Expressive Work Entitled to First Amendment Protection.</u>

As explained in *Brown v. Entertainment Merchants Association*, 131 S.Ct. 2729, 2733 (2011), video games are core speech entitled to First Amendment safeguards:

> Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection . . . . [W]hatever the challenges of applying the Constitution to ever-advancing technology, "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary" when a new and different medium for communication appears.

*See also Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47, 58 (2006) ("Video games are expressive works entitled to as much First Amendment protection as the most profound literature.")

In *Novalogic*, where Activision confronted allegations of trademark infringement similar to the claims raised here for use of a different disputed mark in its *Call of Duty: Modern Warfare 3* game, the district court concluded that the game's "compelling narrative and music, distinctive characters, how the players interact with the virtual environment as they complete a series of combat missions, how players can interact with other players, and how players control the fate of the characters and the world that they inhabit," rendered it worthy of "as much First Amendment protection as any motion picture or any other expressive work." *Novalogic, Inc. v. Activision Blizzard*, 2013 WL 8845232, *9 (C.D. Cal. June 18, 2013).

Its highly realistic visual graphics, complex narratives, distinctive use of music and sound, and multitude of dimensions on which players may interact with the game and one another, earn *Ghosts* the same status. Review of the filed copy of *Ghosts* and videos of game play reflects that

the game's multi-player mode—in which the "angry monkey" patch appears—exhibits all of the characteristics *Novalogic* recognized in *Modern Warfare 3* and deserves safe haven under the mantle of First Amendment protection for video games set forth in *Brown*. That multi-player mode allows gamers to customize characters, select "maps" for play, and drive the outcome— rather than follow the predetermined plot available in single-player mode—does little to undermine this point. *See Brown*, 131 S.Ct. at 2738 (Video games do not present "special problems" merely because they are "interactive"; such a "feature is nothing new: Since at least the publication of The Adventures of You: Sugarcane Island in 1969, young readers of choose-your-own-adventure stories have been able to make decisions that determine the plot by following instructions about which page to turn to.").

MSM, however, contends that this step of the Ninth Circuit's framework includes a threshold requirement that a mark must be a "cultural icon" in order for the *Rogers* two-pronged test, discussed further below, even to apply to its use in the underlying work. (*See* Opposition, p. 16.) It bases this argument on a misreading of *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900-02 (9th Cir. 2002) (finding against the "Barbie" trademark holder in favor of the creators of the song "Barbie Girl" to deem the song, which pokes fun at the values its creators felt were represented by the Barbie brand, an expressive work), and cites for support an outlier decision from this district, *Rebelution, LLC v. Perez*,732 F.Supp.2d 883 (N.D. Cal. 2012).[4] While *Mattel* indeed opined that "with fame comes unwanted attention," and that a trademark owner certainly may not prohibit all reference to his or her mark once it "becomes an integral part of our vocabulary,"—as Barbie has—the fact that Barbie made its way into the global lexicon does not mean every mark must do so in order for its use to be protected by the First Amendment.

---

[4] *Rebelution* ruled in favor of the plaintiff reggae band by the trademarked name Rebelution in a Lanham Act claim against the artist Pitbull, who released an album with the same name. Whether or not *Rebelution* comports with Ninth Circuit law, the case is inapposite here because in that instance, Pitbull's use of the mark bore no connection or reference whatsoever to the reggae band. Here, by contrast, *Ghosts'* incorporation of an "angry monkey" patch that draws upon a trademark patch design extremely popular in the military world is precisely what imbues the game's use of the mark with artistic relevance.

*Mattel*, rather, stands for the proposition that a trademark owner may not control public discourse whenever the public "imbues his mark with a meaning beyond its source-identifying function"—a far more inclusive standard than the "cultural icon" one MSM advocates. 296 F.3d at 900. Moreover, *Mattel* applies this rule not as a threshold limitation to reaching *Rogers*, but rather as part of the analysis under *Rogers'* first prong. Subsequent Ninth Circuit authority affirms this reading. MSM points out that *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.* does not contain a discussion of the threshold to applying *Rogers* because in that case, the plaintiff E.S.S. conceded that the video game at issue was entitled to First Amendment protection. E.S.S. did so, however, *not* on the premise that the mark at issue was a "cultural icon," but rather because the game was an expressive work. 547 F.3d 1095, 1100 (9th Cir. 2008) (finding First Amendment protection for the *Grand Theft Auto* video game creator's depiction of the real-life Los Angeles strip club Play Pen in the game as "Pig Pen" despite noting that "the Play Pen is not a cultural icon"). The court clearly states as much: "E.S.S. concedes that the game is artistic and that therefore the *Rogers* test applies." *Id.* at 1099-1100.

As addressed further below, because of its popularity among military personnel and the significance of patches in the military world, MSM's "angry monkey" mark has taken on a meaning beyond purely denoting a link to MSM. *Ghosts'* multi-player mode makes protectable use of this meaning under the *Rogers* test.

B. <u>*Ghosts*' Use of the "Angry Monkey" Design Is Protected By the First Amendment.</u>

Trademark law is concerned with protecting the symbols, elements and devices used to identify a particular product in the marketplace, and to prevent confusion as to its source. *New Kids on the Block v. News America Publishing, Inc.,* 971 F.2d 302, 305 (9th Cir.1992); *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 13 (D.D.C. 2004). It offers mark owners a means to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by or affiliated with the trademark owner. Accordingly, "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Mattel,* 296 F.3d at 900 (internal quotation marks and citations

omitted).

As *Ghosts* constitutes an expressive work, the question becomes whether Activision's particular use of MSM's "angry monkey" mark within the game merits First Amendment protection. To decide whether the First Amendment precludes Lanham Act and related claims, the Ninth Circuit has adopted the test developed by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). As *Rogers* declared, "in general, the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Rogers*, 875 F.2d at 999. The Ninth Circuit expressly adopted this test in *Mattel,* as discussed above, and later extended it to apply not only to titles of works, but furthermore to registered marks used in the bodies of other works. *See E.S.S.*, 547 F.3d 1095.

The Ninth Circuit's two-pronged analysis based on *Rogers* finds an artistic work's use of a trademark that would otherwise violate the Lanham Act not actionable unless (1) the use of the mark has "no artistic relevance to the underlying work whatsoever," or (2) it has some artistic relevance, but "explicitly misleads as to the source or the content of the work." *E.S.S.,* 547 F.3d at 1100.

   *1.   "Artistic Relevance"*

*Mattel* and its Ninth Circuit progeny are highly protective of speech. "[O]nly the use of a trademark with 'no artistic relevance to the underlying work whatsoever' would not merit First Amendment protection. In other words, the level of relevance merely must be above zero." *E.S.S.,* 547 F.3d at 1100. While *E.S.S.* readily acknowledged that Los Angeles's Play Pen strip club was by no means a "cultural icon," the court held that a reasonable way for the video game creators to achieve their artistic vision—a "cartoon-style parody of East Los Angeles"—was to recreate a "critical mass" of the buildings and businesses that constitute it. It was, therefore, of "some artistic relevance" to include a strip club "similar in look and feel to the Play Pen," even if the club had little to do with the premise of the game. 547 F.3d at 1100.

The creators of *Ghosts*' multi-player mode likewise aimed to design a realistic combat experience, the intensity of which is heightened by sophisticated features permitting players to

customize their avatars' identities and engage with other players in the virtual environment. The incorporation of combat force names, military gear, geographic locations, and myriad other real-world references coalesce into a "critical mass," not unlike that in *E.S.S.*, to achieve a "look and feel" consistent with the game creators' vision. One small part of this vision is the "angry monkey" patch, which when placed alongside many other patches used in *Ghosts*, represents part of an authentic universe of morale patches, like those available in the real world. The parties agree that "morale patches are popular among military personnel and are often worn in unofficial contexts to allow the wearer to express a sense of personal of identity," and that the "angry monkey" is "among MSM's most well-known designs." (Compl., ¶¶ 14,15.) Its inclusion in the game therefore bears "some artistic relevance" to the creators' goal of offering players a feeling of personal identity and authenticity during game play.

MSM offers no support for its conclusory allegation that Activision's use of MSM's mark has no expressive purpose, and only incorporates the "angry monkey" design into *Ghosts*' menu of available patches to gain a misleading endorsement from MSM. It argues that Activision's use of the "angry monkey" design bears no artistic relevance to *Ghosts* because the armed forces prohibit soldiers from choosing to wear unofficial morale patches on their uniforms out in the field. But MSM invokes no authority, nor is there any, for the proposition that use of a mark must sufficiently mimic reality to fall within the First Amendment's safe haven. *See Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1246 (9th Cir. 2013) (noting the use of football player Jim Brown's name and likeness to represent players on teams which no longer exist and with jersey numbers other than his own in the video game *Madden NFL* did not detract from the game's First Amendment protection). Nor does the fact that the "angry monkey" design only appears in multi-player mode, may not be selected by any player, and may not appear for many hours or sessions of game play, diminish that its artistic relevance to *Ghosts* is "above zero." *See E.S.S.*, 547 F.3d at 1100 (noting that the "Pig Pen" in *Grand Theft Auto* is in no way central to the game's narrative).

MSM's allegation that *Ghosts*' use of the "angry monkey" mark constitutes purely commercial speech, precluding it from broad First Amendment protection, is similarly without merit. MSM itself defines commercial speech as that which "does no more than propose a

commercial transaction." (Opposition, p. 6, citing *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011).) That the *Ghosts* "angry monkey" design briefly appears in the pre-release trailer for the game's multi-player mode and (for free to all players) in a menu that also allows players to access additional patches for purchase, does not diminish its artistic relevance within the game.[5] MSM, therefore, puts forward no genuine issue of material fact as to whether the use of the "angry monkey" design in *Ghosts* meets this prong of the *Rogers* test.

### 2. "Explicitly Misleading"

"Explicitly misleading" use of a mark requires that the defendant make an affirmative and overt statement that indicates a relationship with or endorsement by the plaintiff. *Rogers*, 875 F.2d at 999 (offering the phrases "an authorized biography" and "Jane Fonda's Workout Book" as examples); *Dillinger, LLC v. Electronic Arts Inc.*, 2011 WL 2457678, *6 (S.D. Ind. June 16, 2011). An instance where the sole indication that the plaintiff might be affiliated with the defendant's work is the use of the mark itself is not "explicitly misleading." *Mattel*, 296 F.3d at 902; *see also Brown*, 724 F.3d at 1245-46 (mere use of the player's likeness was insufficient to meet this standard).

MSM fails to demonstrate a genuine issue of material fact as to whether Activision has behaved in an "explicitly misleading" manner. Indeed, MSM has not put forth a single argument that Activision has affirmatively purported in any way to share a relationship with MSM. As noted in *Novalogic*, "given the huge success of its *Call of Duty* franchise, Activision understandably has made every effort to affirmatively negate any possible confusion regarding the

---

[5] Specifically, MSM avers that Activision "assigned particular prominence and importance to the [disputed mark], in that it is one of fewer than five patch designs featured in [the promotional trailer]." (Compl. ¶ 31.) Additionally, the Declaration of Richard Graves MSM submitted refers to promotional videos Graves viewed on the Internet that contain multiple appearances of the mark, copies of which were not lodged with the Court. (Graves Decl. ¶¶ 14-16.) Yet even if Activision has included the "angry monkey" patch in its trailer and other videos for promotional purposes, this would not strip it of its "artistic relevance" and First Amendment protection. For example, in *Mattel*, the court ruled for the defendant "Barbie Girl" song creators, even though they undisputedly used the "Barbie" trademark to "create[ ] and s[ell] to consumers in the marketplace commercial products . . . that bear the Barbie mark." 296 F.3d at 903; *see also Winchester Mystery House, LLC v. Global Asylum, Inc.*, 210 Cal. App. 4th 579, 591 (2012) (holding that there was no "triable issue of material fact," even though the use of the defendant's trademark may well have been "merely a crass marketing tool" rather than an artistic choice).

source of [*Modern Warfare 3*]." *Novalogic*, 2013 WL 8845232 at *12. The same is true here: Activision's *Ghosts* packaging is very clear as to its origin and source, prominently bearing the title *Call of Duty*, identifying its creator as Activision, and boasting to be "the best selling first person action franchise of all time." (Miller Decl., Exhibit 2.) MSM's sole contention to address this prong of *Rogers*—that Activision has included its version of the "angry monkey" design in promotional materials and thereby "actually mis[led] consumers"—therefore falls short. (Opposition, p. 23.)[6]

### V.  CONCLUSION

For all of the foregoing reasons, MSM has failed to present a genuine issue of triable fact to overcome Activision's contention that its use of the "angry monkey" mark in *Ghosts* is protected by the First Amendment. Accordingly, Activision's motion for partial summary judgment on MSM's claims for trademark infringement under the Lanham Act; false designation of origin; unfair competition under California statute; and common law trademark infringement, is granted.

**IT IS SO ORDERED**.

Dated: November 24, 2014

RICHARD SEEBORG
United States District Judge

---

[6] MSM's anecdotal evidence of "actual confusion" caused by Activision's use of the mark—that of blogger Richard Graves as attested to in the Graves Declaration (*see* ¶ 18)—also does little to tip the scales on this prong. *See Brown*, 724 F.3d at 1245-46 (adding "survey evidence" to the "mere use of a trademark alone" "changes nothing . . . . To be relevant, evidence must relate to the nature of the behavior of the identifying material's user, not the impact of the use."); *see also Rogers*, 875 F.2d at 1001 (disregarding a survey showing that 38% of 201 respondents believed Ginger Rogers was affiliated with the film, the court held, "to the extent that there is a risk that the title will mislead consumers as to what the work is about, that risk is outweighed by the danger that suppressing an artistically relevant though ambiguous title will unduly restrict expression."). MSM offers no contrary authority to demonstrate the legal relevance of its submitted evidence.